# CIRCUIT COURT OF FAIRFAX COUNTY

Eung Hee Lee et al.

v.

Moon Sik Park et al.

April 4, 2007

Case No. CL-2006-5364/5242

BY JUDGE ARTHUR B. VIEREGG

The captioned actions arise out of a landlord-tenant dispute related to commercial property situated at 7203 Little River Turnpike, Annandale, Fairfax County, Virginia. The premises were owned by landlords, Moon Sik Park and his former wife, Hyon Bossere Chung (collectively, "Landlords"). Park managed the property, which is the subject of this action. Chung did not play a role in the events that are the subject of this litigation. Landlords leased the premises to EHL as a site for catering and holding weddings and other events using the trade name, "Yanni Total Wedding & Banquet" (sometimes referred to as "Yanni").

Fairfax Circuit Case Number CL-5242 is an unlawful detainer action filed by the Landlords in the Fairfax County General District Court against EHL seeking possession of the premises on account of EHL's alleged nonpayment of rent. That case was later removed to this court.

In the meantime, the tenant, EHL, and its officers and lease guarantors, Eung Hee Lee and Jong Woo Han (collectively, "Tenants"), initiated CL 2006-5364 against Landlords alleging damages for various torts and Landlords' alleged breach of the lease stemming from Landlords' refusal to approve the Tenants' assignment of the premises. Landlord filed a counterclaim, which was twice amended. In its last iteration, Landlords sought a judgment for unpaid rent and for the return of certain personal property and fixtures on the premises in detinue. The two cases were later consolidated for trial.

Tenants' complaint alleges eight causes of action: Count I: Breach of Lease; Improper Denial of Assignment; Count II: Intentional Interference in Contract and Business Expectancy; Count III: Defamation; Count IV: Breach of Lease; Declaratory Judgment; Count V: Breach of Lease; Intentional Interference in Business, Restraining Order; Count VI: Intentional Interference in Contract and Business Expectancy; Count VII: Conspiracy to Harm Business; and Count VIII: Intentional Infliction of Emotional Distress, Restraining Order. (Count VIII is brought only by Plaintiff Lee.) After the parties' respective motions to strike, all of Landlords' claims remained, but only Counts III, IV, and VI of Tenants' causes of action survived. Landlords did not move to strike Count IV.

## I. *Landlords' Claim for Unpaid Rent*

On July 30, 2002, Landlords and Tenants entered into a written lease of the premises. The lease term commenced on August 1, 2002, and ended on July 31, 2007, unless otherwise extended. Rent was payable monthly. The amount of rent for the premises increased during the lease term. The lease provided that Tenants were not responsible for payment of rent until November 1, 2002. Between November 1, 2002, and April 30, 2003, rent was payable to Landlords in the amount of $15,000 per month; it increased to $17,000 per month between May 1, 2003, and April 30, 2004; and it increased to $18,000 per month between May 1, 2004, and April 30, 2005. Commencing May 1, 2005, rent was to annually increase by three percent on the anniversary of the lease commencement date until the termination of the Initial Term, July 31, 2005. Accordingly, between May 1, 2005, and July 31, 2005, the rent was $18,000 per month; between August 1, 2005, and July 31, 2006, it was increased to $18,540 per month; and between August 1, 2006, and July 31, 2007, it increased to $19,096.20 per month. Landlords contend Tenants owe unpaid rent exceeding $150,000. Tenants contend they overpaid rent owed pursuant to the Lease.

## A. *Background of Disputes Related to the Payment of Rent*

Although rent was due on the first day of each month, it was rarely paid on that day. Tenants did not regularly pay rent pursuant to payment deadlines in the Lease. Landlords did not seek to collect rent when due each month. Nor did the Landlords enforce late payment penalties. Park, Lee, and Han all testified rent was irregularly demanded and paid to Park, who frequently visited the premises and haphazardly would demand payments. Furthermore, payments would sometimes be made on multiple occasions during a given month. Tenants, moreover, made rent payments by personal checks, cash, cashier checks, and third-party checks endorsed over to Park.

Park documented Tenants' rental payments in what the parties refer to as his "black book,"[1] which was entered into evidence as Pl. Exhibit 69. (Evidence admitted by Landlords was marked "Plaintiffs' " exhibits; evidence admitted by Tenants was marked "Defendants' " exhibits.) Park testified each time he received a rent payment, he signed a receipt, delivered it to Tenants, and documented it in his black book. He conceded, however, that some rent payment notations were not made contemporaneously with his receipt of payment. *See* Tr. at 236:1-7; 242:9-14.

The focus of Landlords' case-in-chief was its introduction of Tenants' accounting as to rent it had paid, which was originally filed as an exhibit to Tenants' grounds of defense to Landlords' unlawful detainer action in Fairfax General District Court. The Tenants' accounting was also incorporated and reasserted in Tenants' affirmative defense to Landlords' counterclaim for rent in the action initiated by Tenants in this Court. Landlords implicitly conceded Tenants had made all rent payments enumerated in their accounting through December of 2005, except those which Landlord specifically disputed in their evidence. The accounting was moved into evidence by Landlords, although it was marked as Pl. Ex. 48. *See id.* at 65:2-66:18. According to Pl. Ex. 48, Tenants paid a total of $713,736 between May of 2003 and December of 2005. Pl. Ex. 48 does not include an accounting of rental payments made in

---

[1] The black book in which Landlords' accounting is maintained is a small, approximately 2 x 6 inch day planner for the year 2003. It is not kept in a straight-forward manner: entries are made from the back of the book to the front; pages are not always used in sequence; references to the years 2003 and 2004 are made by "sticky" notes; some entries are made upside down such that the reader must turn the book around to read the entries; and pages are sporadically torn out of the book.

2006. Park testified that Tenants paid no rent in 2006 (Tr. at 235:20-23) and that Tenants did not pay rent between January and May of 2006, but that, since May 1, 2006, Tenants have been providing Landlords with monthly checks that cover not only rent owed, but also relevant taxes (Tr. at 317:1-17). Tenants, however, contend that rent was paid throughout 2006 and, in fact, resulted in an overpayment of $27,214.52 (a figure that includes payment of both rent and taxes). Tr. at 452:10-453:4. Tenants also contend that, since the end of April of 2006, they have been providing Park with monthly rent checks. Tr. at 372:14-373:14. *See* Pl. Ex. 48. Although rent was payable in a monthly amount of either $17,000 or $18,000 during this time period, their accounting suggests Tenants simply paid rent as they were able. For example, Pl. Exhibit 48 shows that Tenants paid only $5,000 in rent for May 2003, but $66,917 in September 2003. This pattern of irregular payments continued in both 2004 and 2005.

At trial, Landlords compared Tenants' accounting to payment entries in Park's black book. Landlords disputed certain Tenants' payments in their accounting as falling into three categories: (1) Payments supposedly corroborated by forged receipts; (2) Tenants' supposed payments that were not made; and (3) Tenants' payments recorded on the accounting made with bad checks. The evidence dealing with each of these categories is addressed below.

### 1. *Forged Receipts*

Landlords contend that Tenants forged nine receipts by adding a "1" in front of numbers written by Park on receipts given to Tenants for amounts actually paid. Park specifically testified Tenants committed the following forgeries, which he claims are substantiated by variances as to the payment noted in his black book:

June 2003: Pl. Ex. 48 shows a payment of $13,000 on June 30; Park testified the payment was for $3,000. *See* Tr. at 72:1-73:11;

August 2003: Pl. Ex. 48 shows a payment of $15,000 on August 20; Park testified the payment was for $5,000. *See* Tr. at 83:1-17;

January 2004: Pl. Ex. 48 shows a payment of $13,800 on January 5; Park testified the payment was received on January 3 in the amount of $3,800. *See* Tr. at 85:2-86:8;

May 2004: Pl. Ex. 48 shows a payment of $13,000 on May 28; Park testified the payment was for $3,000. *See* Tr. at 87:8-88:11; 89:4-13;

June 2004: Pl. Ex. 48 shows a payment of $13,300 on June 14; Park testified the payment was for a total of $3,300. *See* Tr. at 96:16-97:6;

September 2004: Pl. Ex. 48 shows a payment of $13,000 on September 9; Park testified the payment was for $3,000. *See* Tr. at 100:5-14;

November 2004: Pl. Ex. 48 shows a payment of $15,000 on November 2; Park testified the payment was for $5,000. *See* Tr. at 101:22-102:15; 104:2-8;

September 2005: Pl. Ex. 48 shows a payment of $15,000 on September 10; Park testified the payment was for $5,000. *See* Tr. at 107:6-19;

December 2005: Pl. Ex. 48 shows a payment of $11,500 on December 13; Park testified the payment was on either December 12 or 13 and was for $1,500. *See* Tr. at 109:1-110:4; 111:15-112:13.

Tenants never produced the original receipts. Tenants claim that Park must have taken the original receipts (*see* Tr. at 482:14-483:11); Park claimed he always gave the original receipts to Tenants (*see* Tr. at 76:7-10).

To substantiate Park's forgery allegations, Landlords presented the testimony of certified document examiner, Katherine Koppenhaver. Koppenhaver explained that a certified document examiner "examines questions that are raised about documents. It could be something that is written on the documents, such as handwriting or signature. It could be alterations to a document, any type of question that arises about documents." Tr. at 192:18-23. Koppenhaver examined copies of the allegedly forged rent receipts and compared them to known samples of Park's handwriting. Park's writing samples were not original samples; Koppenhaver scanned and copied them from Park's black book of payments. *See* Tr. at 200:15-21. After examining and comparing the style of penmanship and pressure patterns, Koppenhaver opined that the "1" in each of the receipts at issue was not written by Park. *See* Tr. at 209:9-214:10. She further testified that some of the commas were not made by Park. *See id.* at 217:11-16.

The Tenants denied these forgery allegations. Tr. at 430:2-14.

### 2. *Payments Never Made*

Park also argues Pl. Ex. 48 is inaccurate because Tenants credit themselves with payments that were never actually made. For example, although Park wrote a receipt on August 3, 2003 that indicated he had received a check for $20,000 (check number 1048) in partial payment of June, July, and August rent, Park avers that he never actually received check 1048. *See id.* at 114:23-115:9; 120:3-14. Park also contests Tenants' documentation in Pl. Ex. 48 of a $10,000 payment on August 5, 2004, explaining that he only received $1,000 cash and a $5,000 cashier's check, and as such, Tenants improperly credited themselves $4,000. *See id.* at 132:12-133:14. Further, Park testified that Tenants double-counted a $3,500 payment as being made in both May and June of 2005. *See id.* at 146:4-150:12.

Finally, Tenants claim a $50,000 payment was made on October 3, 2003. Pl. Ex. 48. Park, however, testified that he only received $8,000 on that date and that his receipt (Pl. Ex. 7A & 7B) reflects a payment of $8,000, not $50,000. *See id.* at 124:14-18; 127:15-22; 128:17-23. Although Park admits that his receipt, in his own handwriting, says "$50,000 payoff," he contends that he did not receive $50,000 at that time. *See id.* at 127:5-22. Rather, it is Park's position that this annotation referenced a prior payment for back rent:

> Q: Now, up at the top, Mr. Park, where it says "$50,000 payoff," can you tell me what that means?
>
> A: Well, EHL had some back rent. What it means that EHL gave me various checks for $5,000, $1,000 and something like that, which was – which were received from private loan club. And it was – they were received before – prior to October 1, 2003.

*Id.* at 124:19-125:4.

### 3. *Double Counting for Dishonored Checks*

The last category of disputed payments contained in the Tenants' accounting are those made with checks that were later dishonored when negotiated: a $4,000 check in February of 2005 (*See id.* at 140:5-15); and a $5,000 check delivered to Landlords in March of 2005 (*See id.* at 142:10-143:21).

## B. *Analysis of Disputes Related to the Payment of Rent*

In their case in chief, Landlords alleged nonpayment of a number of payments listed in Pl. Ex. 48, a total of $170,500 in payments that are not recorded in Landlords' black book. Landlords' post-trial memorandum to the Court acknowledges that Tenants failed to account for $11,500 in rental payments, which, according to Landlords, would make the difference between the accountings $159,000. However, this evidence was not presented at trial. The analysis of Landlords' claim for unpaid rent hinges upon the issue of which party bears the burden of proving discrepancies in the Tenants' accounting. The Landlords have admitted many of the payments reflected in Tenants' accounting, but as seen, they dispute others. Having disputed receipt of payments from Tenants, the Tenants bore the burden of proving those payments:

As a general rule, a party who alleges payment as a defense has the burden of proving it. Accordingly, a party who alleges that an obligation has been extinguished must prove facts or acts giving rise to the extinction. . . . One who relies on payment as a defense cannot avoid the burden of proving it by neglecting to plead it. Even where the plaintiff must allege nonpayment, the general rule is that the burden rests on the defendant to prove payment rather than on the plaintiff to prove nonpayment.

49 Am. Jur. 2d, *Payment*, § 115.

Accordingly, once Landlords alleged that payments were not made, the Tenants bore the burden of proving those payments were in fact made. Although Landlords went further than merely claiming payments were not made and introduced additional proof of nonpayment, such as the introduction of the Koppenhaver testimony regarding the forgeries, the Tenants still were required to prove by a preponderance of the evidence that the payments were made. At trial Tenants' evidence was principally the cross-examination of the Landlords' witnesses and the Tenants' arguments related to exhibits introduced by the Landlords such as the payment receipts analyzed by Koppenhaver. In the end, all of the evidence introduced by both parties must be evaluated in determining whether the evidence presented by Tenants preponderated in its evidentiary value over that presented by the Landlords.

### 1. *Forged Receipts*

According to Landlords, a large portion of Tenants' inaccurate accounting results from Tenants' forgery of $90,000 worth of receipts. Specifically, Landlords allege that Tenants did not pay this $90,000, instead having simply written a numerical "1" in front of the amounts previously written by Park on receipts.

Tenants, however, as discussed, always bore the burden of proving that the receipts relied upon and signed by Park represented payments they had made in the amounts reflected on the disputed receipts. Although Park's black book method of accounting for rent paid by the Tenants raises questions as to the reliability of his black book, I find that, with respect to the nine alleged forgeries, Tenants did not sustain their burden of proving they made the nine disputed rent payments, which Landlords contend were forged.

Tenants' evidence provides little additional support for the payments reflected in their accounting. In particular, they provide no plausible

explanation as to why Tenants do not have the original nine receipts that Landlords contend were forged. First, Han testified that Tenants' accounting was based on copies of receipts signed by Park. However, Tenants did not produce a single original receipt, nor could they advance a plausible explanation why they did not have the originals of the receipts signed by Park. The purpose of maintaining an original receipt is for a debtor to prove payment to a creditor. Second, it is a remarkable coincidence that, of the approximately twelve copies of receipts retained by Tenants, nine are identified by Park as forgeries. The Tenants bear the consequences of their failure to insist upon and maintain originals of receipts signed by Park for rent payments made.

I was not persuaded that the testimony of Koppenhaver, the Landlords' document examiner, proved that the numeral "1" on the contested receipts was forged. While I recognize Koppenhaver, a qualified handwriting expert, may have the ability to discern minute differences in the writing of various individuals, her testimony did not persuade me she could do so in this case. As Tenants pointed out during her cross-examination, Koppenhaver did not review a single original sample, which affected her ability to examine the indentations made by the writer;[2] she undercut Park's own testimony in at least one instance by testifying that there are two forgeries on a single entry where Park had already testified that only a single "1" was added each time;[3] and she noted that one of the factors upon which she based her opinion, the discontinuity of the allegedly forged "1s," was also present in the companion numbers to the "1s" that Landlords admit were made by Park's hand.

However, it is noteworthy that the Tenants' failure to maintain original receipts precluded Koppenhaver from comparing the ink used in writing the numeral "1" on the contested receipts. Plainly, such an analysis might have been conclusive. This circumstance raises the inference that, if the originals had been available, they would have proven the receipts were not in Park's handwriting. *See Wolfe v. Virginia Birth-Related Neuro. Injury Comp. Program*, 40 Va. App. 565, 580-82 (2003) (adverse inference permitted where defendant failed to perform tests that would have established malpractice).

---

[2] Koppenhaver testified that the indentations would have shown the "appearance of the pressure" used to make the mark. Tr. at 222:10-223:2.

[3] Tr. at 218:13-219:1.

The Tenants' case is also undermined by the fact that Han, who performed Tenants' accounting, was unable to explain how amounts $1,000 or $10,000 greater in value appear on his copies of receipts, but do not appear in Park's black book.

Tenants did not introduce important evidence (i) that they would have been expected possess; (ii) that they would have been expected to obtain, because the evidence supported their position; or (iii) that they were in the best position to obtain and introduce as evidence: cancelled checks, third-party checks endorsed over to Park, or bank statements.

Finally, Landlords presented evidence during their case-in-chief that went beyond a mere allegation of nonpayment. Park testified that various entries in his black book confirmed payments in amounts which corresponded with Tenants' receipt copies but for the addition of an additional "1," which had the effect of increasing the amount supposedly paid by either $1,000 or $10,000. Further, the Court received testimony from Koppenhaver, which, while not sufficient in itself to prove the forgeries, when considered with all the evidence, has been given some, albeit not decisive, weight in considering the forged receipt payment issue.

When all of the evidence related to the supposed forged receipts is taken into account, I find that the Tenants did not prove the $90,000 in payments supported by the copies of the allegedly forged receipts.

### 2. Payments Never Made

There are four payments that Landlords claim were never made: (1) a $20,000 check Landlords claim they never received; (2) an August 5, 2004, payment that Landlords contend should only be $4,000, rather than Tenants' documented $10,000; (3) Landlords' contention that Tenants double-counted a $3,500 payment; and (4) the issue of the "$50,000 payoff." For each of these, Landlords allege nonpayment.

With regard to the $20,000 check, Landlords introduced into evidence Pl. Ex. 5B (which is translated in Pl. Ex. 5C). It is an August 30, 2003, receipt written by Park confirming receipt of $30,000, inclusive of a $10,000 check and the $20,000 check at issue here. On cross-examination, however, Park admitted that he made an annotation for receipt of $30,000 in his black book, dated August 30, 2003. Tr. at 249:4-250:10. Although Park's testimony here references Ex. 38, which was not admitted into evidence, the parties' agreed that Ex. 38 was a duplicate of a page of the black book, which had previously been admitted into evidence. Thus, Mr. Gross was permitted to cross-examine Park as to Ex. 38 for ease of reference by the Court and Mr. Osnos. Tr. at

228

247:17-249:10. Although Tenants did not produce a copy of Check 1048, Park's testimony regarding the documentation of the $30,000 payment in both his black book and in the receipt was not refuted by Landlords. Not only was it not refuted, but no explanation was provided by Landlords as to why a $30,000 payment was noted in the black book and a corresponding receipt was drafted if no payment was actually made. Accordingly, Tenants' evidence regarding the payment of the $30,000 is more believable than Landlords'. Landlords may not recover the $20,000.

With regard to the issue of the inappropriate $6,000 credit, Park testified and referred to a receipt written by him that he only received payment on August 5, 2004, in the amount of $4,000. Tenants failed to address this discrepancy on either cross-examination or in their case-in-chief. Therefore, they did not meet their burden of proving payment. Landlords may therefore recover the $4,000 they allege was not paid.

Park also alleged that Tenants inappropriately counted a $3,500 rental payment twice: once in May of 2005 and once in June of 2005. During his cross-examination, Park was shown a copy of a $3,500 check dated May 4, 2005. Park admitted to receiving the check on June 3, 2005. *See id.* at 152:23-153:12. He also admitted that he failed to issue a receipt for it. *Id.* However, Park testified that the black book showed payments of only $2,500 for the months of May and June of 2005. Park's testimony, however, was otherwise confusing. By admitting that he received a check dated May 4, 2005, in June of 2005 and by further admitting that he never issued a receipt for this check, Park undermines the credibility of his own accounting. Specifically, his testimony suggests he in fact received two checks, each in the amount of $3,500, as argued by Tenants. Accordingly, I find the evidence of the Tenants to be the more believable as to this contested payment.

Finally, Landlords contend Tenants never paid $42,000 of a $50,000 payment, which Tenants included in their accounting as having been made in October of 2003. Neither Landlords nor Tenants allege that the $50,000 was paid with a single check. Both parties argue that the payment consisted of multiple checks that totaled $50,000. Although Tenants did not address this issue in their case-in-chief, they did obtain an admission from Park that the black book refers to a $50,000 payment on October 5, 2003. *See id.* at 246:9-22. Further, on cross-examination, Park admitted that he had no documentation of the $8,000 payment in his black book. *Id.*

Landlords introduced evidence during their case-in-chief that the $50,000 documented by Tenants in Pl. Ex. 48 actually related to a prior payment of $50,000. Park testified that the October 3, 2003, receipt (Pl. Ex. 7B) referring to a "($50,000 pay off)" directly below the sentence, "Received

are the below amounts as partial payments for rent," relates only to previous payments of back rent. The receipt, however, does not explicitly reference the $8,000 Park claims to have received in the form of two checks, copies of which were admitted into evidence as Pl. Ex. 7A.

In their post-trial brief, Landlords refer to Lee's deposition testimony (Pl. Ex. 49). Landlords contend that Lee's testimony there corroborates Park's explanation that the $50,000 was paid to and received by Landlords in September of 2003. While Lee's testimony affords a different view of when she gave Park money and in what amount, Lee substantiates Park's version of events when she explains the notation of "($50,000 payoff)" in the receipt:

Q: Well, did you give [Park] $42,000 in September of 2003?

A: Something like that. That's why I guess I said out of $50,000.
And then he also said here, $50,000 payoff in partial rent.

This deposition testimony tips the balance in Landlords' favor. Lee's explanation corroborates Landlords' allegation of nonpayment and their argument that the $50,000 was received prior to October of 2003. Accordingly, Tenants failed to satisfy their burden of proving this $42,000 payment.

### 3. *Dishonored Checks*

Finally, Landlords claim Tenants improperly accounted for two dishonored checks in Pl. Ex. 48. Tenants did not prove payment of these checks. In fact, Han's testimony only served to bolster Landlords' position. Han, who prepared Tenants' accounting, delivered a muddled account, alleging that he both did and did not consider dishonored checks in the accounting. Further demonstrating his failure to recognize the impact of a dishonored check on the accounting, Han stated he had no idea whether any checks were dishonored. On the contrary, Park substantiated his claim that the $4,000 check was returned, noting the entry in his black book that reads, "2/10 4000 check return." As to the $5,000 check received March 20, 2005, Park testified as to a receipt (Pl. Ex. 26A, translation in Pl. Ex. 26B) that clearly noted the check was received on March 20 and was dishonored on March 28. Given Han's inconsistent testimony, and considering the evidence put forth by Landlords, Tenants did not prove payment of these apparently dishonored checks by a preponderance of the evidence.

## II. *Landlords' Claim for Unpaid Taxes*

In addition to the payment of rent, Tenants were obligated, under the lease, to pay real property taxes:

> Tenant shall pay its proportionate share of all real property taxes and Landlord's property/liability insurance in twelve (12) equal monthly installments, without deduction or set-off of any kind, including the cost of any contest of an assessment by Landlord, which may be levied or assessed against the premises during the Initial and any Renewal Term of this Lease by any lawful authority for each calendar year (or fiscal, if applicable) year commencing on November 1, 2002. Notwithstanding anything to the contrary, Landlord hereby waives the right to collect Tenant's proportionate share of all real property taxes until July 1, 2003.

Landlords' Ex. 67 at 4-5, ¶ 8.

Landlords contend that Tenants failed to pay property taxes throughout the leasehold and seek to recover those taxes under a cause of action for breach of contract. To establish a breach of contract claim, Landlords must prove "(1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff." *Brown v. Harms*, 251 Va. 301, 306 (1996) (internal citations omitted).

The legal obligation is easily established here because the tax provision is written into the lease, which is endorsed by both parties. The issue then is whether there was a breach of such provision. As the party seeking to establish the breach, Landlords have the burden of proving such breach. *See id.* To do so, Landlords must demonstrate the amount of taxes owed and Tenants' failure to pay such amount.

At trial, Park testified as to the relevant taxes for the years 2003, 2004, 2005, and 2006, but Landlords were unable to gain the admission of documents substantiating these assessments. Park estimated that the taxes were "around $45,000 plus tax" in 2003; "around, you know, $45,000 or $48,000" in 2004; "about the same" in 2005; and "$42,000 or something" in 2006. Landlords attempted to admit into evidence documents that would corroborate Park's testimony, but were unable to lay a proper foundation for a public records exception such that the documents could overcome Tenants' hearsay objection. *See* Tr. at 58:5-60:9. Further, Landlords introduced no evidence to demonstrate Tenants' failure to pay the taxes owed, nor did they

offer any evidence of enforcement of the tax provision of the lease prior to bringing suit against Tenants. In fact, Han testified that, until discovery commenced in this case, he had no idea of the amount of taxes owed because Landlords never provided such information to Tenants during the tenancy. Tr. at 447:21-448:3. Han estimated the property tax "up to December" (presumably December of 2006, *see* Tr. at 452:10-16) was $93,243.52, but explained he did not learn of the amount of any property tax owed until discovery began in this case.

Because Landlords failed to prove the amount of taxes owed by Tenants, Landlords failed to satisfy their burden of proof as to this breach of contract claim. They may not recover for any unpaid taxes.

### III. *Park's Use of the Leased Property*

Tenants allege they entered into a sublease agreement with Landlords pursuant to which Landlords agreed to pay Tenants for Park's use of portions of the leased premises. Having received no payment from Landlords in accordance with this alleged agreement, Tenants brought a cause of action against Landlords for breach of the sublease. "Essential elements of a cause of action for breach of contract are: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff." *Brown*, 251 Va. at 306. As set forth below, it is plain that the agreement here, if one existed, was an oral agreement. As such, Tenants must establish Landlords' obligation under the agreement by first proving the existence of a valid and enforceable agreement. *See Richardson v. Richardson*, 10 Va. App. 391, 395 (1990) ("[T]he proponent of the oral contract has the burden of proving all elements of a valid enforceable contract."). "To be valid and enforceable, the terms of an oral agreement must be reasonably certain, definite, and complete to enable the parties and the courts to give the agreement exact meaning." *Id.* at 396. An oral agreement will not be enforced if its terms "are vague and uncertain, or the evidence is insufficient to establish the contract." *Woodbridge v. Outland*, 212 Va. 157, 161 (1971). The statute of fraud generally precludes enforcement of oral contracts regarding real property. *See Beach v. Virginia Nat'l Bank*, 235 Va. 376, 378 (1988). However, because Landlords did not raise the statute of frauds at trial or in their pleadings, it is not presently before the Court. Only after the Tenants have proven the existence of the oral contract may this Court evaluate any alleged breach or damages suffered as a result of such breach. *See Brown*, 251 Va. at 306.

While it is undisputed that Park occupied a portion of the leased property for *some* period of time, and that Park agreed to pay for his use of that space, the terms of the oral sublease are unclear in several respects. Like so many aspects of this case, the issue is made difficult by the un-businesslike way in which the parties conducted their business affairs with one another.

The parties agree that Park used both an upstairs and downstairs portion of the leased premises. Tr. at 459:19-21; 460:4-21. Park converted the downstairs portion into an office for his flooring company, Champion Floor, and later used the upstairs as an apartment. *See id.* at 301:4-7; 347:20-22; 460:4-21; 755:15-17. The parties further agree that, before Park converted the downstairs into an office, Tenants had used it to store items for their events; and that Park built shelves so that Tenants would have a place to store the items that his office had displaced (*see id.* at 348:11-20; 728:4-10; 754:19-755:2);[4] and that Tenants were using the upstairs for storage before Park converted it into an apartment (*see id.* at 731:1-9). Once Park began to occupy the upstairs, he constructed a wall and stairs such that he could come and go to the upstairs unit by going through his Champion Floor office. Other facts regarding the parties' sublease agreement and Parks' use and occupancy of the two portions of the premises he occupied are less clear and in dispute.

The parties disagree as to the square footage of the respective spaces subleased by Park; how long Park used the respective spaces occupied; and the amount agreed upon by the parties for his use of the respective spaces subleased. Park testified he used approximately 250-350 square feet of space of the leased premises, but it is difficult to discern whether Park's estimate encompasses both the downstairs and upstairs spaces. *See id.* at 299:17-19; 300:14-21. Later testimony, however, suggests that Park's estimate only applied to the downstairs portion. *See id.* at 728:4-10 (testifying that office space was approximately 250 square feet). Han testified Park used approximately 600 to 700 square feet of space. *See id.* at 459:19-460:6. Like Park, however, Han did not specify whether his testimony applied to one or both of the two portions of the premises occupied by Park. Further, the only conclusive evidence of the total square footage of the leased premises is in the lease, which identifies the premises as consisting of 12,000 square feet. Park testified that Tenants occupied 24,000 square feet and the pizza place 8,000 square feet for a total of 20,000 square feet. Because there is plainly a math

---

[4] It is unclear from the evidence whether the shelves were built inside the room that became Park's office or somewhere else in the building. The date upon which the shelves were constructed is also unclear.

error in this testimony and because this testimony was not corrected during the trial, I cannot rely upon Park's testimony as to the square footage of the leased premises. After considering the vague testimony provided, I conclude that Han's estimate includes both the upstairs and the downstairs areas.

The difficulty with this conclusion, however, is that the parties are at odds as to the duration of Park's occupancy of the subleased space. According to Han, Park began to occupy the downstairs portion on January 1, 2003. *See id.* at 454:5-17; 459:10-18. Park counters that he used the downstairs space only for a three-month period though it is not clear from Park's testimony when that three-month period began. Park testified that he used the space in July, August, and September of 2002. Tr. at 300:14-21. He later testified that he used it for a three-month period commencing in August of 2002. Tr. at 727:13-728:10. As for the upstairs, the parties agree that Park used the upstairs portion as his personal apartment. Han testified that Park began to occupy the upstairs and downstairs simultaneously. *See id.* at 755:15-17. Park testified that he only occupied the upstairs at a later point in time for a period of two months. Park's testimony on this issue is also inconsistent: he testified he began a two-month occupancy of the space in August of 2005 (Tr. at 301:4-7); that he only occupied the space during the months of October and November of 2005 (Tr. at 301:4-11); and that he occupied the upstairs until December of 2005 (Tr. at 731:17-732:3). Chung testified that Park continuously lived with her until June 30, 2005. *See id.* at 752:4-6.

Next is the matter of the value of the rental subcontract. Han and Lee both testified that Park agreed to pay $1,700 per month for Park's use of the premises, though Lee was under the impression that Park would pay her directly, rather than deduct the $1,700 from Tenants' rent. *See id.* at 348:21-349:15 (Lee); 458:20-459:3 (Han). Park's testimony is different. Park explained that he agreed to deduct $1,000 per month from rent for his use of the downstairs (*see id.* at 299:22-23), and that later, when he used the upstairs, he agreed to a deduction of $1,200. *See id.* at 734:11-21.

Given the above-described discrepancies between the parties regarding the terms of the contract, namely (1) the amount of space used by Park; (2) the time period in which Park used the space; and (3) the rent Park was to pay Tenants for his use of the space, I cannot give the terms of any alleged agreement between the parties an exact meaning. I conclude Tenants failed to prove crucial terms of the oral sublease with certainty. That notwithstanding, Park conceded at trial to the existence of a subcontract for his use of the space, and more specifically, he conceded that the sublease(s) required him to compensate Tenants for his use of the space. Given this concession, I award Tenants damages consistent with Park's testimony. Namely, Tenants are

awarded $9,000: $1,000 per month for a three-month period in 2002 and $1,200 per month during the five month period of August to December of 2005.

## IV. *Tenants' Counterclaims*

EHL advanced eight theories of recovery against Park and Chung in its counterclaim against them. Following Park's motion to strike, four of these counts were dismissed. Three counts remained; Tenants' breach of the oral sublease has been addressed *supra*. Landlords did not move to strike Count IV. In Count IV, EHL sought a declaratory judgment by which they contend EHL had leased a portion of its leased premises to Park at a square foot rental. As explained in Section II, *supra*, the amount of the space occupied by Park and the time for which it was rented is in conflict. For the reasons stated in Section II, rent in the amount of $9,000 has been credited to Tenants for amounts otherwise owed pursuant to the lease. Both a summary of the evidence supporting the remaining counterclaims for defamation (Count III of its complaint) and intentional interference with Tenants' business (Count VI) and my decision as to Tenants' counts against Landlords follows.

## A. *Count III: Defamation*

In Count III of its counterclaim, Tenants contend that, when it tried to sell its business and assign its lease, Landlords purposely thwarted that endeavor by defaming Tenants and their reputation by statements made to the prospective purchasers. Tenants specifically alleged that, when the potential buyers contacted Park, Park refused to agree to the assignment of the lease because Tenants owed him significant overdue rent. Both Lee and Han testified these statements were tantamount to an allegation that Tenants were dishonest, that they did not pay their debts when due, and that they did not conduct their business in a competent manner. Tenants claim that, as a consequence, the purchasers elected not to purchase Yanni, their business reputation was injured, they were "harmed in all their business affairs," and they were "forever hampered in marketing their services to the general public." Compl. ¶ 23.

Not a single third-party witness, not even the prospective Yanni purchasers, testified at trial as to the alleged defamation or that the supposed defamation resulted in their failure to pursue the purchase of Yanni. No witness testified that specific defamatory words were spoken, that such words were spoken by Park, that the sale was lost as a consequence of such words, or

that the Tenants' business reputation was adversely affected by such allegedly defamatory words. Further, Tenants advanced no evidence of other harm visited upon the Tenants as a consequence of Park's alleged statements, nor did they show they were "hampered in marketing their services to the general public." Notwithstanding these deficiencies, Landlords contend that any statements made to purchasers about rent arrearages were qualifiedly privileged. Landlords' motion to strike Tenants' evidence based on this qualified privilege was overruled, because (1) privilege was the only basis for Landlords' motion; and (2) a qualified privilege is one that required the court to consider all of the evidence.

Tenants' defamation claim is one riddled with fatal defects. First, in pleading a cause of action for defamation, a plaintiff must allege actionable defamatory language with particularity. *See Federal Land Bank v. Birchfield*, 173 Va. 200, 213 (1939). Assuming such action is sufficiently pleaded, the plaintiff must prove, by a preponderance of the evidence, that the allegedly defamatory statement was (1) false and that the defendant knew it to be false or unreasonably failed to determine the veracity of the statement; and (2) that the statement was published to a third party. *See Food Lion v. Melton*, 250 Va. 144, 150 (1995); *see also Union of Needletrades, Indus. & Textile Emples., AFL-CIO v. Jones*, 268 Va. 512, 519-20 (2004); *Cybermotion, Inc. v. Vedcorp, L.C.*, 41 Va. Cir. 348, 348 (1997) (plaintiff must prove defendant "intentionally or negligently, published unprivileged statements about Plaintiff that were false and malicious and that were injurious to his reputation."). A plaintiff further bears the burden of substantially proving " `a sufficient number' of the defamatory words . . . `to make out a good cause of action'." *Government Micro Resources, Inc. v. Jackson*, 271 Va. 29, 41 (2006) (quoting *Birchfield*, 173 Va. at 215). Tenants fail to satisfy all of these requirements.

On its face, Tenants' complaint is deficient. It merely alleges, "Defendants, with actual malice and with reckless disregard for the truth, claimed that Plaintiffs owed Defendants a very large sum of money for unpaid rent and other charges"; and "Defendants informed the Purchasers of this debt, knowing that this information was false and defamatory toward Plaintiffs (or through reasonable inquiry should have known that this information was false and defamatory toward Plaintiffs.)" Complaint, ¶ 21 at 7. Plainly, Tenants did not allege the defamatory language with particularity, although this stark deficiency apparently was not raised by Landlords.

At trial, Tenants failed to meet their burden of proving both that the supposed defamatory statement was published and false. Although they alleged publication of the supposed false statement, Tenants failed to introduce any evidence regarding publication, either by introduction of

testimony or exhibits. Furthermore, any statement made by Park to the prospective purchasers regarding rent owed by Tenants was plainly not false: as explained *supra*, Tenants owed Landlords rent when they sought the Landlords' approval of the lease assignment.

Because Tenants have failed to establish the elements necessary to prove defamation, they are not entitled to relief and may not be awarded compensatory damages. *See Gazette, Inc. v. Harris*, 229 Va. 1, 15 (1985) (plaintiff only recovers compensatory damages "upon proof by a preponderance of the evidence that the publication was false, and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based."). Moreover, because Tenants have not proved Park communicated the allegedly defamatory statement to the purchasers or that the statement was in fact false, they have not proved the purchasers' failure to pursue the lease assignment and purchase of the business was due to Park's alleged statement. In addition, since the failure to purchase the business plainly would have eventuated from Park's refusal to approve the assignment of the lease, any statement Park made relating to Tenants' supposed overdue rent could not have proximately caused the failure of the lease assignment and purchase.

Finally, Park relied on a qualified privilege to protect his own interest in refusing to approve the lease assignment because the rent was in arrears. *See Smalls v. Wright*, 241 Va. 52, 54 (1991). A claim of qualified privilege may only be overcome by a plaintiff who proves malice by clear and convincing evidence. *See Government Micro Resources, Inc. v. Jackson*, 271 Va. 29, 41 (2006). In this case, given the failure of both parties to maintain or introduce records reasonably reflecting when rent was paid and in what amount, Tenants' contention that it has proved malice with respect to the supposed statement that Tenants owed Park significant but otherwise un-quantified rent is wholly without merit.

For all the above reasons stated, EHL's defamation count is dismissed.

### B. *Count VI: Interference with Contract*

In Count VI of its complaint, Tenants contend Landlords, by virtue of statements made by Park to a reporter for the *Korean Times* and the subsequent publication of that interview in the Korean community, were planning the redevelopment of the leased property during the tenure of the lease agreement. Tenants alleged Landlords thereby intentionally and tortiously interfered with EHL's existing contracts to provide weddings and

other group events at the premises. Lee and other witnesses testified that, after the interview was published in the *Korean Daily*, EHL's business precipitously fell off. However, Tenants failed to call a single witness to show that he or she had chosen not to hold a wedding or other event at the leased premises on account of the newspaper article.

As Landlords argue in their post-trial brief, in order to prevail on an interference claim, a plaintiff must not merely prove that the defendant intentionally engaged in conduct that caused injury to the plaintiff, but the plaintiff must also prove that such conduct was wrongful. As Landlords emphasize, the lease agreement afforded them the right to redevelop the commercial property, even where Tenants would be forced to relocate their business. Pl. Ex. 67 ¶ 17.b, p. 7-8. In such event, Tenants would have the right of first refusal to lease comparable space in accordance with the same terms in the lease. *Id.*

Under such circumstances, Park had the right to plan improvements to Landlords' property. Moreover, interference claims, like defamation claims, are subject to the defense of qualified privilege. *See Maximus, Inc. v. Lockheed Inf. Mgmt. Systems*, 254 Va. 408, 412 (1997); *Chaves v. Johnson*, 230 Va. 112, 121 (1985). Furthermore, the evidence is undisputed that, when Park learned that the *Korean Daily* reporter had misstated the dates when Park planned to begin construction, he contacted the newspaper and a correction was published shortly thereafter. Tr. at 721:9-725:1. Under the facts of this case, which have not been well-developed, I conclude that Tenants have failed to sustain their burden of proof to make out a *prime facie* case of actionable interference with contractual relations. Further, Landlords have otherwise proven that their conduct is qualifiedly privileged.

For the foregoing reasons, Count VI of Tenants' Complaint is dismissed.

## V. *Detinue*

In Paragraph C of their Second Amended Counterclaim, Landlords sought a judgment based on the Tenants' failure to pay for certain personal property on the premises sold to the Tenants at the commencement of the lease term. Alternatively, Landlords prayed by way of a detinue to recover "any fixtures, equipment, and other tangible personalty [that were located on] the premises as of July 30, 2002." Second Am. Counterclaim ¶ 4; Va. Code, Article 12, § 8.01-114 *et seq*. By order of October 13, 2006, the Honorable Stanley P. Klein sustained the demurrer for recovery of a money judgment for the sale proceeds, apparently because the parties' contract for the sale of the

personalty was an oral agreement and therefore barred by the applicable three year statute of limitations. Va. Code § 8.01-266.4. At trial, Landlords pursued their detinue claim for the return of fixtures and personal property. It is subject to a five year limitations period. Va. Code § 8.01-243(B), *and see Ansari v. Pahlavi*, 23 Va. Cir. 402 (1991).

In support of Landlords' detinue action, Park testified that, at the inception of the Lease, Tenants had agreed to buy specified fixtures and equipment that were located on the premises. Park testified the parties orally agreed Tenants would pay $100,000 for the equipment and fixtures, $50,000 when the Lease was signed and the $50,000 balance on September 24, 2002. Park further testified he delivered a Bill of Sale to the Tenants, Pl. Ex. 58. The Bill of Sale stated the equipment and fixtures that were the subject of the sale were listed on "Exhibit A" apparently intended to be attached to it. The Bill of Sale does not otherwise enumerate the equipment and fixtures sold. No Exhibit A was attached to it. *See* Tr. 184:3-19. Park testified vaguely that the equipment and fixtures included "cooking [equipment], food [equipment], [a] refrigerator, [a] table and chairs, all kinds of kitchen stuff." *Id.* 183:12-15. Later, on cross-examination, Park explicitly testified, or otherwise implicitly implied, that certain items were fixtures, such as the shelves, the industrial dishwasher, the stove hood, and bar that were fixed to the real property while others such as fryers and a small grille were not. *See id.* at 280-81. Park failed to otherwise identify the precise personalty that was the subject of the bill of sale.

In deposition testimony, Lee confirmed that an agreement to buy fixtures and equipment had been required by Park as a condition of leasing the premises. However, she testified the subject of the agreement was principally a very large bar,[5] a dishwasher, a two bar coolers, one freezer, a walk-in cooler, less than 100 glasses, and a chandelier. She did not provide any additional description of the personal property.

Tenants advanced two affirmative defenses: the statute of limitations and the statute of frauds. Each of these affirmative defenses is without merit. As indicated *supra*, the statute of limitations for a detinue action is five years. Landlords' counterclaim was timely filed on August 11, 2006, within the five-

---

[5] Pl. Ex. 49, reflects that, in a portion of Lee's deposition not designated by Landlord's counsel and not counter-designated by Tenants' counsel, Landlords had agreed to the removal of the bar when it was condemned by the Health Department shortly after the Lease had commenced. Pl. Ex. 49, 29-31.

year limitations period. Further, as Landlords argued at trial, the statute of frauds defense regarding contracts for the sale of goods fails in the face of the debtor's sworn testimony of the oral agreement. *See* Va. Code § 8.2-201(2)(b).

Nevertheless, the Landlords bore the burden of proving facts necessary to make out its detinue claim. In order to maintain an action for detinue, a plaintiff must prove: (1) a right of property in the personal property to be recovered; (2) a right of immediate possession; (3) that the property is capable of immediate possession; (4) the property has some value; and (5) that the defendant had possession at some time prior to the commencement of the action. *See Vicars v. Atlantic Discount Co.*, 205 Va. 934, 938 (1965).

It is plain that the parties' oral contract involved a sale of fixtures (which constitutes real property) and personal property. The office of an action for detinue, however, is only to recover personal property, not fixtures. *See* 66 Am. Jur. 2d, § 133, at 578 ("The action of detinue lies only for the recovery of personal property. It does not lie for the recovery of fixtures.") Furthermore, the property sought to be recovered must have value and must be clearly distinguishable from other property. *See id.* "[M]ore certainty is required in a detinue action than in other cases because the specific property sued for is sought to be recovered, and it is therefore necessary for that the property be specifically identified or clearly distinguishable from other property." 66 Am. Jur. 2d, *Replevin*, § 138, 580.

The above summary of the evidence, however, demonstrates that most of the items, and presumptively most of the value paid or promised to be paid, were for fixtures not personalty (e.g., the giant bar, the shelves, the stove hood, and the industrial dishwasher). The evidence suggests that the giant bar, the stove hood, and the industrial dishwasher, all fixtures, were the most valuable of the items for which the $100,000 was promised and $50,000 paid. The essence of the combination of the Lease of the premises and the "sale," at least as it pertained to the fixtures, appears to have been a long term lease of these fixtures as they would have reverted to Landlords at the end of the lease. Therefore, the agreement plainly was not for a sale of these fixtures that were part of the real estate owned by the Landlords, and thus the $100,000 simply afforded Tenants the right to use them in connection with the lease of the premises. Given that the fixtures were part of the premises leased, it may well be the case that there was insufficient consideration for the agreement but that issue was not framed by the parties. The remaining items of personal property appear to have been depreciable items, which where never sufficiently identified by Park or Lee. The importance of specifically identifying personal property sought in a detinue action is confirmed by the following statement from Judge Burks' treatise:

> As the [detinue] action is to recover specific personal property, it must be described with reasonable certainty, so that possession may be given of it if recovered. Such a general description as "one horse," or so much money not marked in any way, would not be sufficient.

*Burks' Pleading and Practice*, 4th edition, § 128, 242. Furthermore, Landlords adduced no evidence that either the fixtures or the items of personal property continue to have value.

After considering all the evidence, I find that Landlords have failed to satisfy their burden of proving a right to return of personal property as most of the items described by Park constituted fixtures. I further find that Landlords have failed to prove the items of personal property sought have value and have failed to identify such items of personal property with sufficient specificity. The Landlords' detinue action is therefore dismissed.

## VI. *Possession*

Landlords originally filed an unlawful detainer action in General District Court for possession of the leased premises on account of Tenants' failure to pay rent. That action was removed to the Circuit Court on May 2, 2006, and therefore remains pending before this Court now. Finding that Tenants were in arrears in rent payment, possession of the premises is awarded to Landlords. While this matter has been under advisement, Landlords sought possession of the premises in accordance with Va. Code § 8.01-127.1(C) for the nonpayment of rent in February of 2007. Pursuant to this motion, I entered an order awarding possession of the premises to Landlords on March 5, 2007.

## VII. *Conclusion*

Mr. Osnos is directed to prepare a final order that awards the following judgments in favor of Landlords:

1. Judgment in favor of Landlords for unpaid rent in the amount of $136,000, which includes all amounts of unpaid rent claimed by Landlords, less the $9,000 owed by Landlords to Tenants for Park's use of the leased premises.

2. The dismissal of Count III: Defamation and Count VI: Interference with Contract of Tenants' complaint.

3. The dismissal of Landlords' counterclaim for return of personal property in detinue.