Present:  Lacy, Keenan, Koontz, Kinser, Lemons, and Agee, JJ.,
and Compton, S.J.

GOVERNMENT MICRO RESOURCES,
INC., ET AL.

v.   Record No. 050943

ALAN W. JACKSON

                              OPINION BY JUSTICE ELIZABETH B. LACY
                                     January 13, 2006
ALAN W. JACKSON

v.   Record No. 050937

GOVERNMENT MICRO RESOURCES,
INC., ET AL.

          FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                   LeRoy F. Millette, Jr., Judge

     Alan W. Jackson sued his former employer Government Micro

Resources, Inc. (GMR) and its Chairman of the Board, Humberto

Pujals, Jr., for breach of contract and defamation.[1]  The jury

returned a verdict in favor of Jackson awarding him $200,500

in compensatory damages on his breach of contract claim and

$5,000,000 and $1,000,000 as compensatory and punitive

damages, respectively, on his defamation claim.  The trial

court granted the defendants' post-trial motion for

remittitur, reducing the breach of contract award to $112,500,

the defamation compensatory damages to $1,000,000, and the

punitive damages to the statutory maximum of $350,000.  Code

§ 8.01-38.1.

Jackson, GMR, and Pujals appealed the trial court's judgment and we have consolidated the appeals for our consideration. GMR and Pujals ask us to reverse the judgment of the trial court. They assert that the trial court erred in failing to strike Jackson's defamation claim and that the evidence did not support a finding of actual malice necessary for an award of punitive damages or to overcome the qualified privilege they contend attached to the alleged defamatory statements. Jackson seeks restoration of the jury's compensatory damage award for his defamation claim.

For the reasons stated below, we conclude that Jackson's defamation claim was not opinion, was timely and properly pled and proven; that actual malice was shown by clear and convincing evidence; and that in holding that the compensatory damage award was excessive, the trial court did not consider factors in evidence relevant to that damage award.

### FACTS

The following facts are relevant to both appeals and we recite them in the light most favorable to Jackson, the party prevailing in the trial court. City of Lynchburg v. Brown, 270 Va. 166, 168, 613 S.E.2d 407, 408 (2005).

---

[1] Jackson also included counts of actual and constructive fraud which the trial court struck.

2

Following his discharge from the army, Jackson served eight years with the National Security Agency where he qualified for top secret and "specially comparted information" security clearances following satisfactory completion of multiple "full lifestyle polygraph" examinations.  Upon leaving the government, he worked for various technical systems companies as senior officer or chief executive officer developing a reputation for successfully turning financially distressed business units into profitable entities and expanding the companies.

In 2001, GMR, a technology resale and services company, sought to increase its services business.  To accomplish this goal, GMR recruited Jackson to serve as president and chief executive officer because of his connections with the federal government, his top secret security clearances, and his extensive experience with technology services in both the public and private sectors.

Jackson began work at GMR on July 9, 2001.  Within a short period, Jackson realized the company's financial situation differed significantly from what he was led to believe when he accepted the position.  For example, GMR's line of credit was significantly reduced because Pujals caused a transfer of properties from the company to himself by using the company's line of credit to satisfy the mortgages on the

3

properties.  Jackson also learned of a $1.1 million loss GMR sustained in the first six months of 2001, a $400,000 accounting error reported by the chief financial officer in August, and a $1.4 million discrepancy between the company's listed inventory and that which it actually held.

In October 2001, as part of its effort to increase its services business, GMR began discussions with Seisint, Inc. (Seisint), a technology company with a super computer it wished to market to the federal government.  Seisint did not have contacts with the federal government, but GMR could provide those contacts through Jackson.  The Seisint executives, Henry E. Asher and Daniel W. Latham, worked directly with Jackson.  Eventually, GMR and Seisint executed a memorandum of understanding detailing GMR and Seisint's agreement to jointly market Seisint's super computer to the federal government.

The remainder of 2001 and the early months of 2002 did not bring a significant change in GMR's financial status.  On March 5, 2002, GMR terminated Jackson's employment for cause.  The termination letter accused Jackson of "gross mismanagement" of GMR's finances.  Pujals admitted, however, that when he wrote the letter he did not have "a specific amount of money in mind" as a basis for that statement.

According to Asher, Pujals called Asher either the day Jackson was terminated, or the next day, and told Asher that Jackson "mismanaged the company and cost him a tremendous amount of money." Latham testified that at a meeting in April 2002 between GMR and Seisint executives Pujals initiated the subject of Jackson's firing and said that "Jackson had been removed from his job because he lost $3 million." Pujals testified that at the April meeting he had responded to Asher's question regarding the details of Jackson's termination by saying the company, and not Jackson, lost $3 million, which resulted in Pujals having to let Jackson go. Pujals admitted that Jackson did not lose $3 million for GMR and that "it would be false if someone said that."

Following his termination, Jackson entered employment discussions with Seisint. Because of the information Asher received from Pujals, Seisint, at Asher's direction did not hire Jackson for a management position but rather engaged him as a sales representative and consultant from March 6, 2002 until December 31, 2002. On January 1, 2003, Seisint hired Jackson as senior vice-president of government programs, which Jackson did not consider a management position.

Pujals was upset when he heard that Jackson was working for Seisint because Jackson would not have known about Seisint if not for GMR. Particularly, Pujals said: "And to find out

5

– and to find out that after we fired him for cause, that he's already employed immediately after and he has already a relationship right after was very, very – a very, very mean thing for him to do."

## I.  The Defamatory Statements

The jury was instructed to return a verdict in favor of Jackson if it found that Jackson proved either of the following two statements:

> Mr. Pujals called Hank Asher within a few days of terminating Mr. Jackson (March 5, 2002).  Mr. Pujals told Mr. Asher that Mr. Jackson had mismanaged GMR, had lost what Mr. Asher perceived or recalled as an exorbitant amount of money, and that Mr. Pujals had to let him go as a result; or

> In April 2002, Mr. Pujals told Daniel Latham, President of Homeland Defense [and] Seisint, Inc., and/or Mr. Asher, founder and CEO of Seisint, Inc., that he fired Al Jackson because Mr. Jackson lost $3 million.

GMR[2] contends that the first statement was not contained in Jackson's pleadings and was not timely asserted, that both statements were opinion and therefore could not be the subject

---

[2] GMR and Pujals filed a joint appeal.  Therefore, throughout our discussion of these appeals, "GMR" will refer to Pujals and GMR collectively unless the context requires otherwise.

6

of a defamation claim, and that Jackson did not prove that GMR uttered either statement in haec verba or with malice.[3]

### A. Pleading the Defamation Claim

Whether Jackson failed to plead and timely assert the first statement, as GMR contends, depends on whether that statement was included in the description of the alleged defamation contained in the motion for judgment and a subsequent bill of particulars. A motion for judgment asserting a claim for defamation that does not recite all the specifics of the alleged defamatory statement, although not good pleading, may nevertheless state a "substantial cause of action imperfectly." Federal Land Bank v. Birchfield, 173 Va. 200, 217, 3 S.E.2d 405, 411 (1939). The particulars of the allegedly defamatory statement may be supplied in a bill of particulars. Id. However, if, in supplying such specifics, a litigant identifies an allegedly defamatory statement that was not reasonably included in the original pleadings, such a statement constitutes a separate claim of defamation and must comply with Code § 8.01-247.1, the one-year statute of limitations for defamation claims. See id. at 217-19, 3 S.E.2d at 411-12.

---

[3] GMR's argument that the evidence was insufficient to support a finding of actual malice in this assignment of error is based on its assertion that the statements were entitled to

7

In this case, Jackson's motion for judgment recited that

> Humberto ("Tico") Pujals and GMR made false and defamatory statements to executives of Seisint, Inc., stating that Mr. Jackson lost $3 million for GMR and was terminated as a result.

In his bill of particulars, Jackson contended that "[o]n or around" April 12, 2002, at a business meeting between certain identified and unidentified Seisint executives and certain representatives of GMR, Pujals stated that in 2001 Jackson lost either "a significant amount" of money for GMR or "enormous amounts" of money for GMR. The bill of particulars also recited that "[o]n or around" April 12, Pujals "made the statement to a Seisint executive (who has requested not to be named) that Mr. Jackson 'lost $3 million for GMR last year.' "

On October 8, 2004, Jackson filed a supplemental answer to GMR's first set of interrogatories based on the de bene esse depositions of Asher and Latham taken by GMR September 20, 2004 and July 13, 2004, respectively.[4] In that answer, Jackson stated that Pujals called Asher "either the day, or within a few days of terminating Mr. Jackson" and told Asher that Jackson had "mismanaged" GMR, that Jackson lost what

a qualified privilege. Qualified privilege is addressed infra.

[4] Jackson's supplemental answer included five alleged defamatory statements. The trial court excluded three statements and they are not at issue on appeal. Therefore, we only address the October 8 interrogatory answer as it relates to the two statements made by Pujals.

8

Asher "perceived or recalled" to be an "exorbitant amount of money," and that Pujals "had to let" Jackson go. The answer also recited that Pujals told Asher and Latham that he fired Jackson because Jackson "lost $3 million."

GMR argues here, as it did in the trial court, that the first statement submitted to the jury involved a March phone call to Asher, which was not pled in either the motion for judgment or bill of particulars but was a new allegation of defamation based on statements first identified in the October 8 interrogatory answer. Because this statement was not pled within the one-year limitations period, GMR asserts that it was untimely and should not have been presented to the jury.

In rejecting GMR's contention, the trial court concluded that the information contained in the October 8 interrogatory answer was "essentially the same allegation" as the statements alleged in the motion for judgment and the bill of particulars and did not constitute a new or separate defamation claim. We find no error in the trial court's ruling.

The defamation claim in the motion for judgment and the bill of particulars was that two statements were made to Seisint executives at an indeterminate time around April 12, 2002, attributing the loss of large amounts of money to Jackson's management of GMR. The October 8 interrogatory answer named a previously "unidentified" Seisint executive to

9

whom one of the statements was made and identified the location and time frame of one of the statements. The information provided in the October 8 interrogatory answer, the motion for judgment, and the bill of particulars was consistent with the statements provided to the jury as Jackson's defamation claim. Therefore, the first statement was pled within the limitations period.

### B. Opinion

GMR next argues that the statements at issue were matters of opinion and thus could not be the basis of a defamation claim. According to GMR, the terms "exorbitant" and "mismanaged" contained in the allegedly defamatory statements submitted to the jury represented Pujals' subjective judgments and were expressions of opinion only.[5]

Statements that express only the speaker's opinion and not matters of fact are not actionable as defamation because such statements cannot be shown to be false. Fuste v. Riverside Healthcare Ass'n, Inc., 265 Va. 127, 132, 575 S.E.2d 858, 861 (2003). "Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." Id. Whether a statement is a statement of fact or

---

[5] GMR also complains that the word "tremendous" reflects opinion, not fact. However, although the jury heard testimony that GMR's financial losses were "tremendous," that word does

10

opinion is a matter of law and is reviewed de novo on appeal. Jordan v. Kollman, 269 Va. 569, 576, 612 S.E.2d 203, 206-07 (2005).

In American Communications Network, Inc. v. Williams, 264 Va. 336, 341-42, 568 S.E.2d 683, 686 (2002), we held that in considering whether a statement was one of fact or opinion, we do not isolate parts of an alleged defamatory statement. Rather, the alleged defamatory statement must be considered as a whole to determine whether it states a fact or non-actionable opinion.

The alleged defamation in this case is that Jackson's mismanagement caused GMR to lose money in 2001 which, in turn, was the basis for Jackson's termination. Whether a company's financial loss is the result of mismanagement is a fact that can be proven. Indeed, in this case, the parties introduced substantial evidence regarding the cause or causes of GMR's financial losses. The evidence also established that government contracting was a very competitive business and success was often based on contacts with "the appropriate people." The trial court observed that the evidence showed that Pujals' statements were made as a matter of fact "with the intent to defame Mr. Jackson so that he would not be able

not appear in the statements submitted to the jury and we need not include it in our discussion.

11

to go to Seisint and get employment with them and cut GMR out of the picture."

Accordingly, we conclude that the trial court did not err in ruling that the alleged defamatory statements were not opinion.

## C. Proof of Defamation

To prevail on a defamation claim, a "sufficient number" of the defamatory words must be proven "to make out a good cause of action. . . . They must be substantially proven as alleged." Birchfield, 173 Va. at 215, 3 S.E.2d at 410. GMR contends that because neither Asher nor Latham could recall the exact words of the first or second statement, respectively, Jackson failed to carry his burden of proof and the trial court should have struck the defamation claim. However, Asher and Latham were not the only persons who testified as to the content of the defamatory statements.

Jackson testified, "in the telephone call with Dan Latham, he told me that . . . Mr. Pujals said I had lost $3 million for GMR, and that's why I had been fired." Jackson also testified that Asher told Jackson that he understood Jackson "lost $3 million for GMR" and that is why Jackson was fired. Pujals testified that he told Asher and Latham that the company lost $3 million dollars and "we had to let Jackson go."

12

Latham testified that Asher was present when Pujals told Latham that Jackson was fired because Jackson had "lost $3 million," and that $3 million "was a large sum of money for a company the size [of] GMR." Asher testified that he had one and possibly two conversations with Pujals in which Pujals told Asher that Jackson had "mismanaged the company" and cost the company "tremendous" amounts of money.

This evidence is sufficient to satisfy the standard that the defamatory words "must be substantially proven as alleged." Birchfield, 173 Va. at 215, 3 S.E.2d at 410.

Finally, GMR complains that the evidence was insufficient to support a finding of actual malice.[6] Actual malice is also required as a basis for awarding punitive damages. GMR has assigned error to the trial court's failure to strike the punitive damage award and, therefore, we will address GMR's arguments regarding the sufficiency of the evidence of actual malice in the following discussion which addresses that assignment of error.

## II. Proof of Actual Malice

GMR also assigns error to the trial court's failure to strike Jackson's claim for punitive damages asserting Jackson

---

[6] In conjunction with this assertion, GMR argued on brief that the trial court erred in finding that the statements were defamatory per se; however, GMR did not assign error to this holding and consequently we do not address it. Rule 5:17(c).

13

failed to provide clear and convincing proof of actual malice. GMR contends that the test we have established for such proof requires "much more than mere falsity" to sustain a finding of actual malice. Citing Jordan, 269 Va. at 580, 612 S.E.2d at 209, and The Gazette, Inc. v. Harris, 229 Va. 1, 50, 325 S.E.2d 713, 746 (1985), GMR asserts that this Court has determined that to establish actual malice, a plaintiff must produce clear and convincing proof that there were reasons for a defendant to doubt the veracity of the defamatory statement or that all judgment and reason were abandoned and no objective basis existed for the defamatory charge. GMR misstates the law and misapplies these cases.

To recover punitive damages in a defamation case, the plaintiff must prove actual malice by "clear and convincing evidence that [the defendant] either knew the statements he made were false at the time he made them, or that he made them with a reckless disregard for their truth." Ingles v. Dively, 246 Va. 244, 253, 435 S.E.2d 641, 646 (1993) (emphasis added). A plaintiff seeking punitive damages can prevail by establishing either circumstance by clear and convincing evidence.

In both cases cited by GMR, the second circumstance – reckless disregard for the truth – was relied upon to show actual malice. In Jordan, the defendant claimed that he did

14

not know that the statements at issue were false; rather, he believed the statements to be true. 269 Va. at 580-81, 612 S.E.2d at 209. Similarly in The Gazette, the Court assumed without deciding that the plaintiff failed to prove that the defendant knew the defamatory statements were false. 229 Va. at 49, 325 S.E.2d at 746. These cases are not relevant to the instant case because Jackson predicates his case of actual malice on Pujal's knowledge that his defamatory statements were false.

In considering GMR's assertion that Jackson did not provide clear and convincing evidence of actual malice, we independently review the record, The Gazette, 229 Va. at 19, 325 S.E.2d at 727, and we review the facts in the light most favorable to the party prevailing below. Jordan, 269 Va. at 577, 612 S.E.2d at 207. The record in this case contains clear and convincing evidence that at the time Pujals made the statements ascribing GMR's loss of large amounts of money in 2001 to Jackson, he knew those statements were false.

Pujals himself testified that he knew Jackson did not lose $3 million for GMR and that "it would be false if someone said that." According to Asher, Pujals called Asher either the day of or the day after Jackson's termination and told Asher that Jackson had mismanaged GMR and lost a tremendous or exorbitant amount of money. Latham testified that at a

15

meeting in April, Pujals also initiated the conversation regarding Jackson stating that "Jackson had been removed from his job because he lost $3 million."  In neither of these conversations did Pujals mention that the company's financial situation had been affected by a reduced line of credit, the $1.1 million loss in the first half of 2001, the $400,000 accounting error, or the $1.4 million drop-ship inventory problem, none of which could be attributed to Jackson.

In summary, Pujals knew his statements were false.  He initiated both conversations in which he defamed Jackson.  Our independent review of the record, considering the evidence in the light most favorable to Jackson, shows clear and convincing proof of actual malice; thus, the trial court did not err in refusing to strike Jackson's punitive damage claim.

### III.  Qualified Privilege

The principle of qualified privilege protects a communication from allegations of defamation if made in good faith, to and by persons who have corresponding duties or interests in the subject of the communication. Smalls v. Wright, 241 Va. 52, 54, 399 S.E.2d 805, 807 (1991).  A plaintiff can overcome the privilege by providing evidence that the statements were made with malice.  Fuste, 265 Va. at 134, 575 S.E.2d at 863.  In this case, the trial court concluded that the privilege did not exist and declined to

instruct the jury on the issue. GMR asserts this holding was error.

We need not resolve whether qualified privilege applied to the alleged defamation in this case because, even if it did, the trial court's failure to instruct the jury was harmless error. In Great Coastal Express, Inc. v. Ellington, 230 Va. 142, 154, 334 S.E.2d 846, 854 (1985), we held that the trial court erred in instructing the jury that a qualified privilege could be overcome if actual malice was established by a preponderance of the evidence. We held such error harmless, however, because the jury awarded punitive damages pursuant to an instruction that required proof of actual malice by clear and convincing evidence. Id. at 155, 334 S.E.2d at 855. Thus, "the jury necessarily found that the plaintiff had carried the heavier burden of proof . . . of malice sufficient to defeat the privilege." Id.

In this case, even if the alleged defamation was entitled to a qualified privilege, the privilege would have been lost if the jury found Pujals uttered the statements with actual malice. As discussed above, the jury was required to and did find that the statements were made with actual malice when it awarded punitive damages. Because we have already concluded that the record supports the award of punitive damages, we hold that any failure to instruct the jury on qualified

17

privilege was harmless error because the privilege would have been lost upon the jury's finding of actual malice.

## IV.  Remittitur

The trial court set aside the jury's $5 million compensatory damage award for defamation and ordered remittitur of $4 million leaving a compensatory damage award of $1 million.  Jackson accepted the judgment of the trial court under protest and filed this appeal pursuant to Code § 8.01-383.1.

A trial court may set aside a verdict because it is excessive if the amount awarded shocks the conscience of the court either because it indicates "the jury has been motivated by passion, corruption or prejudice" or "has misconceived or misconstrued the facts or the law," or because it is so disproportionate "to the injuries suffered as to suggest that it is not the product of a fair and impartial decision." Shepard v. Capitol Foundry of Virginia, Inc., 262 Va. 715, 720-21, 554 S.E.2d, 72, 75 (2001) (quoting Edmiston v. Kupsenel, 205 Va. 198, 202, 135 S.E.2d 777, 780 (1964)); Poulston v. Rock, 251 Va. 254, 258, 467 S.E.2d 479, 481 (1996).

The trial court in this case concluded that the $5 million jury verdict was shockingly excessive, explaining that it did not believe the jury was motivated by "bias, passion,

18

or prejudice," but rather "misconceived or misunderstood the facts or the law." The trial court opined that the jury confused and commingled elements of contract and defamation damages leading to an excessive compensatory defamation award.

In reviewing a trial court's order of remittitur, we apply an abuse of discretion standard. Shepard, 262 Va. at 721, 554 S.E.2d at 75. Applying this standard requires a two-step analysis: (1) we must find in the record both the trial court's conclusion the verdict was excessive and its analysis demonstrating that it "considered factors in evidence relevant to a reasoned evaluation of the damages" when drawing that conclusion, and then (2) we must determine whether the remitted award is "reasonab[ly] relat[ed] to the damages disclosed by the evidence." Poulston, 251 Va. at 259, 467 S.E.2d at 482 (quoting Bassett Furniture Indus. v. McReynolds, 216 Va. 897, 911-12, 224 S.E.2d 323, 332 (1976)). "Both of these steps require an evaluation of the evidence relevant to the issue of damages" and mandate that we consider the evidence in the light most favorable to the party awarded the jury verdict, in this case Jackson. Shepard, 262 Va. at 721, 554 S.E.2d at 75.

Jackson asserts the trial court abused its discretion in concluding the $5 million jury verdict was excessive. The record contains the trial court's conclusion the verdict was

excessive and its reasons for that conclusion.  However, we do not find support for the trial court's conclusion in the record because the trial court failed to consider, in the light most favorable to Jackson, all the "factors in evidence relevant to a reasoned evaluation of the damages."  Poulston, 251 Va. at 259, 467 S.E.2d at 482.  Thus, we hold that the trial court abused its discretion in setting aside the jury verdict on compensatory damages for defamation and in ordering remittitur.

The trial court's explanation for its belief that the jury misconceived or misunderstood the facts and the law is that the jury was confused about which of Jackson's injuries could be compensated in the defamation award.  An obvious example of the jury's confusion and commingling, according to the trial court, was the jury's breach of contract award. Neither party disputes that the jury was confused and improperly included in the breach of contract award $88,000 related to defamation.  This confusion and commingling, according to the trial court, indicates that the jury was also confused and improperly commingled other elements and evidence of damages in setting the defamation award.

The trial court, appropriately, did not rely solely on the jury's mistake regarding the breach of contract award as sufficient support for its belief that the jury was also

20

confused and included improper elements of damage in the defamation award. The trial court identified other factors and evidence which it believed supported the conclusion that the defamation award was the product of confusion and inclusion of improper elements of damage.

The trial court first identified as a source of confusion the jury instructions disallowing emotional distress damages on the breach of contract claim but allowing such damages on the defamation claim. These instructions, in the court's view, led the jury to include in the defamation award emotional distress damages that arose not from the defamation, but from Jackson's termination. This conclusion, however, is not supported by the record.

The trial court, in response to GMR's motion in limine, excluded any evidence of emotional distress damages based on Jackson's termination from GMR, and we find no such evidence in the record. Nevertheless, GMR attempts to defend the trial court's conclusion by referencing portions of the record out of context where Jackson refers to his emotional state at the time of his termination from GMR.

As evidence that Jackson's emotional distress stemmed from his termination, GMR cites Jackson's testimony that he "was already under quite a bit of pressure as it was, since [he] had been terminated with no severance" and that the

21

defamation was "in addition to the shock" Jackson had already endured. However, Jackson made these statements in response to counsel's inquiry regarding his reaction upon learning of the defamation. GMR also highlights Jackson's discussion of "having to start over" and "build a career again." This testimony did not, as GMR suggests, pertain solely to his employment situation upon termination from GMR, but also to his career "at the moment" of trial when he was still trying to overcome the harm resulting from the defamation. Therefore, viewing the evidence in the light most favorable to Jackson, we conclude that the record does not contain sufficient evidence regarding Jackson's emotional distress caused by termination from GMR to conclude that the jury included damages based on such emotional distress in its defamation award.

Next, the trial court reasoned that the jury improperly included in the defamation award economic injuries Jackson had identified as flowing from his loss of employment with GMR, such as loss of GMR stock options. The trial court found that statements Jackson's counsel made during argument on the remittitur motion reinforced its conclusion. Again, the record does not support this conclusion.

Jackson introduced evidence of the potential benefits stemming from his employment with GMR as part of his fraud

claims. The trial court struck those claims and so instructed the jury. Nowhere in the record did Jackson claim these potential benefits as an element of damages, either for breach of contract or for defamation.

While arguing against remittitur, Jackson's counsel did not identify those economic benefits as an element of Jackson's damages, but rather discussed them in response to the trial court's inquiry regarding why the amount of the award, $5 million, was not shocking. Counsel explained that in the context of this case, $5 million was not an extravagant amount because chief executive officers and members of management in these types of businesses regularly dealt in multi-million dollar opportunities such as those Jackson identified as having taken place at GMR prior to his termination. And, counsel continued, the jury was entitled to consider numbers of such size in making the defamation award because corporations were not offering Jackson such opportunities following the defamation, although they had offered opportunities to him prior to the defamation.

More importantly, in considering reasons which might account for the size of the defamation award, the trial court ignored other evidence and elements upon which the jury could have based the award. The trial court held that the defamatory statements constituted defamation per se and

properly instructed the jury that Jackson was entitled to
compensatory damages for injury to his personal and business
reputation, humiliation, and embarrassment without proof of
any actual or pecuniary injury.  The trial court also
instructed the jury that in determining damages for the
defamation claim it could

> take into consideration all of the circumstances
> surrounding the statement, the occasion on which it
> was made and the extent of its publication, the
> nature and character of the insult, the probable
> effect on those who heard the statement, and its
> probable and natural effect upon the plaintiff's
> personal feelings and upon his standing in the
> community and in business.
>
> Your verdict should be for an amount that will fully
> and fairly compensate him for:
>
> (1)  any loss or injury to his business;
>
> (2)  any insult to him including any pains,
>      embarrassment, humiliation, or mental
>      suffering;
>
> (3)  any injury to his reputation; and
>
> (4)  any actual, out-of-pocket losses that were
>      caused by the statement.

In deciding to order remittitur, the trial court failed to
address Jackson's evidence regarding injury to his reputation,
humiliation, and embarrassment.  The trial court also failed
to acknowledge Jackson's right to recover greater damages
because he presented evidence of his untarnished reputation
prior to the defamation and of his fear the defaming remarks

24

reached members of the business community beyond the Seisint executives.  See Poulston, 251 Va. at 261-62, 467 S.E.2d at 483.

Jackson established that though he immediately began working for Seisint after his termination, the defaming remarks caused him to lose the chance of obtaining a management position and the lucrative opportunities available to similarly situated managers.  From March 2002 to January 2003, Jackson worked in sales and as a consultant to Seisint and other companies.  His earnings were largely commission-based, dependent upon his success in selling Seisint's systems to the federal government.  When Seisint eventually hired him, Jackson did not hold what he considered a management position because he did not report to the chief executive officer, was not included in management meetings, and had no ability to make management decisions.  Seisint hired approximately six managers in the year Jackson served as a consultant and employee.  Jackson expressed distress and humiliation due to losing his opportunity to manage after 25 years:  "It made me feel, frankly, quite humiliated and as though I was underused, and it put me in a stressful situation where I didn't have much control."

Jackson established his unblemished reputation by testifying to his rise in his field, including obtaining and

25

maintaining coveted top-level security clearances with the federal government through multiple extensive "lifestyle polygraph" examinations. He also discussed his fears about wider publication of the defaming remarks when he testified to receiving no inquiries from potential employers after sending resumes to "tens of people literally" compared to 15 months earlier, prior to the defamation, when he had three potential job opportunities.

In determining that the defamation award was excessive, the trial court did not address the injuries presumed in defamation per se or the evidence regarding the impact of the defamation on Jackson's emotional state, reputation, and employment opportunities, all of which the jury was entitled to consider. Therefore, the record does not support a finding that the trial court "considered factors in evidence relevant to the reasoned evaluation of the damages." Poulston, 251 Va. at 259, 467 S.E.2d at 482.

Finally, GMR also contends we should affirm the trial court's order because, in comparison with other verdicts for defamation upheld in Virginia, the defamation award in this case is excessively large. In the recent case of Rose v. Jaques, 268 Va. 137, 597 S.E.2d 64 (2004), we declined to compare verdicts as a means to measure a verdict's excessiveness, but instead analyzed, as we have today, whether

the jury was influenced by passion, corruption, or prejudice, or misunderstood the facts or law. Id. at 159, 597 S.E.2d at 77 (citing Shepard, 262 Va. at 720-21, 554 S.E.2d at 75). Additionally, verdicts for defamation per se are not suitable for comparison because each case is factually unique and because juries are entitled to presume and award compensatory damages even if the plaintiff cannot prove actual injury. See Poulston, 251 Va. at 260-61, 467 S.E.2d at 483. Thus, we find no merit in GMR's argument that Jackson's verdict is excessive when compared with other defamation verdicts.

## V. Summary

In summary, the alleged defamatory statements were timely and properly pled and proven and were not statements of opinion. Assuming without deciding that the statements were entitled to qualified privilege, the failure to instruct the jury on this issue was harmless error because actual malice was established by clear and convincing evidence. The trial court abused its discretion in setting aside the jury award for compensatory damages based on defamation and in ordering remittitur because the record does not support the trial court's conclusion that the award was excessive or was the product of jury confusion and commingling. Further, the trial court failed to consider elements of recovery upon which the

27

compensatory damage award could be based and the evidence which supported those elements.

Accordingly, we will affirm the judgment of the trial court, but will reverse that portion of the judgment setting aside the compensatory damage award on Jackson's defamation claim and ordering remittitur and enter final judgment reinstating the jury verdict on that award.

Record No. 050943 – <u>Affirmed.</u>
Record No. 050937 – <u>Reversed and</u>
<u>final judgment.</u>

28