PRESENT: All the Justices

ALLIED CONCRETE COMPANY, ET AL.

                                            OPINION BY

v.  Record No. 120074        JUSTICE CLEO E. POWELL

                                    January 10, 2013

ISAIAH LESTER, INDIVIDUALLY AND
AS ADMINISTRATOR OF THE ESTATE
OF JESSICA LYNN SCOTT LESTER

ISAIAH LESTER, INDIVIDUALLY AND
AS ADMINISTRATOR OF THE ESTATE
OF JESSICA LYNN SCOTT LESTER

v.  Record No. 120122

ALLIED CONCRETE COMPANY, ET AL.

FROM THE CIRCUIT OF THE CITY OF CHARLOTTESVILLE
Edward L. Hogshire, Judge

In these combined appeals, we consider whether the trial court erred 1) in denying a motion for a new trial based on the undisputed misconduct by the plaintiff and his attorney; 2) in denying a motion for a mistrial based on juror misconduct; and 3) in remitting the jury verdict.

## I. BACKGROUND

On June 21, 2007, Isaiah Lester ("Lester") was driving his wife, Jessica, to work, traveling west on the Thomas Jefferson Parkway in Albemarle County, Virginia.  At the same time, William Donald Sprouse ("Sprouse"), an employee of Allied Concrete Company ("Allied Concrete"), was operating a loaded concrete truck and traveling east on the Thomas Jefferson Parkway.  Due to his speed, Sprouse lost control of his vehicle,

causing it to cross the center line and tip over, landing on the vehicle occupied by Lester and Jessica.  As a result Jessica suffered injuries that ultimately proved to be fatal.  Sprouse subsequently pled guilty to manslaughter in the death of Jessica.

On May 16, 2008, Lester, as Administrator and beneficiary of Jessica's estate, filed a complaint against Allied Concrete and Sprouse, seeking compensatory damages for economic and non-economic losses, including mental anguish, for the wrongful death of Jessica.  Jessica's parents ("the Scotts") were also named as statutory beneficiaries.  Lester also filed a separate complaint against Allied Concrete and Sprouse, seeking compensatory damages for his personal injuries.  These actions were ultimately consolidated.

## A. TRIAL

Trial in this case commenced on December 7, 2010.  After a three-day trial, the jury awarded Lester $6,227,000, plus interest, on the wrongful death action, and $2,350,000, plus interest, on his personal injury action.  Similarly, the jury awarded each of the Scotts $1,000,000, plus interest, on the wrongful death action.

Allied Concrete filed multiple post-trial motions, including motions for sanctions against Lester and the lead

2

attorney on the case, Matthew B. Murray[1] ("Murray"), arguing that Lester conspired with Murray to intentionally and improperly destroy evidence related to Lester's Facebook account and provided false information and testimony related to his Facebook page, his prior use of anti-depressants, his medical history, and the spoliation of Facebook evidence. Further, Allied Concrete contended that Murray engaged in deception, misconduct, and spoliation related to Lester's Facebook account. Allied Concrete also filed a motion seeking, alternatively, dismissal of Lester's claims, a new trial on liability and damages, a new trial on damages only, or a remittitur order, arguing that the misconduct of Lester and Murray precluded an impartial trial and verdict and resulted in an excessive verdict. Finally, the defendants filed a motion for mistrial due to newly discovered juror bias.

The trial court allowed extensive discovery on the post-trial motions, received written submissions, conducted an evidentiary hearing, received the parties' proposed findings of fact and conclusions of law, and entered a 32-page order detailing its findings of fact and conclusions of law.

---

[1] At that time, Murray was the managing partner for the Charlottesville office of Allen, Allen, Allen & Allen (the "Allen Firm").

B. SPOLIATION OF FACEBOOK EVIDENCE

On January 9, 2009, during the pendency of the actions, Lester sent a message through Facebook to David Tafuri ("Tafuri"), an attorney for Allied Concrete. As a result, Tafuri was able to access Lester's Facebook page.

On March 25, 2009, Allied Concrete issued a discovery request to Murray, seeking production of "screen print copies on the day this request is signed of all pages from Isaiah Lester's Facebook page including, but not limited to, all pictures, his profile, his message board, status updates, and all messages sent or received." Attached to the discovery request was a copy of a photograph Tafuri downloaded off of Lester's Facebook account. The photo depicts Lester accompanied by other individuals, holding a beer can while wearing a T-shirt emblazoned with "I ♥ hot moms." That evening, Murray notified Lester via email about the receipt of the discovery request and the related photo.

The next morning, on March 26, 2009, Murray instructed Marlina Smith ("Smith"), a paralegal, to tell Lester to "clean up" his Facebook page because "[w]e don't want any blow-ups of this stuff at trial." Smith emailed Lester requesting information about the photo. Smith also told Lester that there are "some other pics that should be deleted" from his Facebook page. In a follow-up email, Smith reiterated Murray's

instructions to her, telling Lester to "clean up" his Facebook page because "[w]e do NOT want blow ups of other pics at trial so please, please clean up your facebook and myspace!"[2]

On April 14, 2009, Lester contacted Smith and informed her that he had deleted his Facebook page. The next day, Murray signed and served an answer to the discovery request, which stated "I do not have a Facebook page on the date this is signed, April 15, 2009." Allied Concrete subsequently filed a Motion to Compel Discovery. On May 11, 2009, Murray told Smith to obtain the information requested in the March 25, 2009 discovery request. Smith contacted Lester, who eventually reactivated his Facebook page. Smith was then able to access and print copies of Lester's Facebook page.[3] After Smith printed the Facebook page, consistent with the previous directive to "clean up" his Facebook account, Lester deleted 16 photos from his Facebook page. On May 14, 2009, Murray sent the copies of

---

[2] Both of these emails were part of the same email thread (collectively referred to as the "March 26, 2009 email"). In a subsequent email, dated November 23, 2010, Murray referred to the March 26, 2009 email as a "stink bomb." Allied Concrete makes much of this fact, even though Murray clearly explains in the November 23, 2010 email that the March 26, 2009 email is a "stink bomb," not because of the content of the email, but because the email would probably upset the trial court.

[3] Smith only printed screen shots of the Lester's Facebook page. These screenshots included small "thumbnail" versions of photographs Lester had uploaded to his Facebook page. Aside from the thumbnail versions, Smith did not print actual copies of any of the pictures Lester had uploaded to his Facebook page.

Lester's Facebook page to Allied Concrete. On October 12, 2009, Murray provided additional, updated copies of Lester's Facebook page to Allied Concrete.

At a deposition on December 16, 2009, Lester testified that he never deactivated his Facebook page. As a result, Allied Concrete had to subpoena Facebook to verify Lester's testimony. Allied Concrete also hired an expert, Joshua Scotson ("Scotson") to determine how many pictures Lester had deleted. Scotson determined that Lester had deleted 16 photos on May 11, 2009. This was later confirmed by an expert hired by Lester to examine Scotson's methodology. All 16 photos were ultimately produced to Allied Concrete.

On September 28, 2010, Allied Concrete served a subpoena duces tecum on Smith, seeking production of all emails between herself and Lester between March 25, 2009 and May 15, 2009. On November 17, 2010, the trial court ordered Lester to file a privilege log, listing everything he claimed was privileged and the basis for the claim. On November 28, 2010, Lester filed an enhanced privilege log. However, Murray intentionally omitted from the enhanced privilege log any reference to the March 26, 2009 email.[4]

---

[4] Post-trial, Murray initially claimed that the omission was a mistake on the part of a paralegal. However, Murray subsequently admitted he concealed the email out of fear that the trial court would grant a continuance.

Ultimately, the trial court decided that Allied Concrete was entitled to sanctions against Lester and Murray. After a further hearing on the matter, the trial court sanctioned Murray in the amount of $542,000 and Lester in the amount of $180,000 to cover Allied Concrete's attorney's fees and costs in addressing and defending against the misconduct.

## C. LESTER'S CREDIBILITY

In addition to lying about deleting his Facebook page, Lester made a number of representations throughout discovery that were ultimately determined to be untrue. Of particular note, it was determined that Lester lied about his history of depression and past use of anti-depressants, and he made false claims about doing certain volunteer work. As a result of these misrepresentations, specifically the deletion of his Facebook page, the trial court ordered that the following adverse inference jury instruction would be given:

> The Court instructs the jury that the Plaintiff, Isaiah Lester, was asked in discovery in this case to provide information from his Facebook account. In violation of the rules of this Court, before responding to the discovery, he intentionally and improperly deleted certain photographs from his Facebook account, at least one of which cannot be recovered. You should presume that the photograph or photographs he deleted from his Facebook account were harmful to his case.

> The Court further instructs the jury that the presumption from this inference should not affect

any award due to the beneficiaries, Gary Scott and Jeanne Scott.

The trial court noted that Allied Concrete knew of the misrepresentations prior to trial. Thus, the trial court ruled that Lester's misrepresentations "related solely to the issue of damages and were mitigated, to the extent appropriate, by an adverse jury instruction, thus, they do not affect the validity of the verdict as to liability." The trial court read the jury instruction twice, once while Lester was testifying and again before the closing arguments.

### D. JUROR MISCONDUCT

During voir dire, the trial court posed the following question to the prospective jurors:

Are any of you related by blood or marriage to any of the attorneys? Do you know them or have significant involvement with them or their law firms?

Only one potential juror, Thomas Hill, responded that he knew several of the attorneys and that he had retained at least one of them in the past. The rest of the potential jurors remained silent.

Post-trial it was discovered that the jury foreperson, Amanda Hoy ("Hoy"), was the former Executive Director of Meals on Wheels of Charlottesville/Albemarle ("Meals on Wheels"). This was relevant because the Allen Firm sponsored the website of Meals on Wheels. Indeed, it was later revealed that Hoy had

8

communicated frequently with representatives of the Allen Firm regarding its sponsorship of the website.  Additionally, it was discovered that members of Murray's family volunteered for Meals on Wheels for more than 15 years and that Hoy knew some of those family members, specifically Murray's mother.  Furthermore, in May 2010, Hoy had a brief email exchange with Murray regarding membership on the Meals on Wheels Board of Directors.  Hoy invited Murray to join the board, but Murray declined.  However, it was also revealed that Hoy had retired from Meals on Wheels approximately six months prior to trial.

The trial court ultimately denied Allied Concrete's motion for a mistrial, ruling that the evidence was "insufficient to prove that Murray had any knowledge of improper conduct by Hoy." The trial court further ruled that, because the meaning of the term "significant involvement" in the voir dire question was subjective, "Hoy could have honestly considered her involvement through Meals on Wheels with the Allen Firm to be insignificant at the time of trial."

E. REMITTITUR

On the issue of remittitur, the trial court examined Murray's conduct during trial, specifically noting "a number of actions designed to inflame the passions and play upon the sympathy of the jury."  Specifically, the trial court took issue with Murray: weeping during opening statement and closing

9

argument, stating that Sprouse "killed" Jessica,[5] invoking God and religion, and mentioning that Allied Concrete had, at one time, asserted that Lester was contributorily negligent.[6]

The trial court ordered remittitur of $4,127,000 of Lester's $6,227,000 wrongful death award, leaving him with an award of $2,100,000. In making its ruling, the trial court stated that it "consider[ed] all of the evidence in the light most favorable to [Lester]." The trial court explained that the jury's award to Lester was "grossly disproportionate" to the $1,000,000 awarded to the Scotts.

> When compared to the award given to the decedent's parents, both of whom had a loving and long-lasting relationship with their daughter, it is clear that the award granted to Lester bears no reasonable relation to the damages proven by the evidence and that the award is so disproportionate to the injuries suffered that it is likely the product of an unfair and biased decision. The disproportionality of Lester's award is further highlighted when seen in light of the fact that Lester had been married less than two years before his wife's death . . . and that his behavior in the tragic aftermath was characterized by extensive social activities and travelling, both in the United States and overseas.

---

[5] In its final order, the trial court incorrectly asserted that Murray had stated that Sprouse "'killed' the plaintiff." However, the actual statement was that "Allied Concrete's employee killed a wonderful woman," which clearly referred to Jessica.

[6] Of these actions, the only one to which Allied Concrete objected and moved for a mistrial was the mention of contributory negligence. The trial court overruled the motion and gave a limiting instruction on the matter.

Commenting on Murray's actions, the trial court further suggested that the jury award "was motivated by bias, sympathy, passion or prejudice, rather than by a fair and objective consideration of the evidence." However, the trial court also noted that

> Murray injected passion and prejudice into the trial, shouting objections and breaking into tears when addressing the jury. Most of Murray's actions in this respect were suffered without objections from defense counsel, who focused their defense upon the denial of liability (despite Defendant Sprouse's admission to having pled guilty to manslaughter in connection with the accident . . .) and upon aggressive, but obviously ineffectual, attacks upon Lester's credibility and character. This defense strategy produced the extreme opposite of its desired effect, serving to create additional passion and sympathy for Lester and anger towards the Defendants.

The court did not modify Lester's $2,350,000 personal injury award or the Scotts' award of $1,000,000 each.

Allied Concrete and Lester appeal.

## II. ANALYSIS

On appeal, Allied Concrete argues that the trial court erred in denying its motion for retrial because of the misconduct committed by Lester and Murray. Allied Concrete further contends that the trial court erred in denying its motion for a mistrial due to juror misconduct on the part of Hoy. Lester, on the other hand, appeals the trial court's decision to grant remittitur.

11

A. PARTY MISCONDUCT

Allied Concrete argues that the trial court erred in
denying its motion for a retrial because the entire trial was
tainted by Lester's dishonest conduct and Murray's unethical
conduct.  Allied Concrete contends that the misconduct had a
cumulative effect that could not be mitigated by anything short
of a new trial.  We disagree.[7]

> A trial court generally exercises "broad
> discretion" in determining the appropriate
> sanction for failure to comply with an order
> relating to discovery.  Consequently, we accord
> deference to the decision of the trial court in
> this case and will reverse that decision only if
> the court abused its discretion . . . .

Walsh v. Bennett, 260 Va. 171, 175, 530 S.E.2d 904, 907 (2000)
(citation omitted).

In its September 1, 2011 order, the trial court gave a
detailed description of each instance of misconduct committed by
either Lester or Murray.  After discussing the extent of the
misconduct, the trial court then explained the steps it took to
mitigate any effects the misconduct may have had on the trial.
It specifically noted that Allied Concrete was fully aware of
the misconduct prior to trial.  Furthermore, it allowed all of
the spoliated evidence to be presented to the jury and gave a

---

[7] While we recognize that Lester's conduct was dishonest and
Murray's conduct was patently unethical, the role of this Court
in the present case is limited to determining whether the
litigants had a fair trial on the merits.

12

jury instruction relating to Lester's misconduct twice, once during his testimony and once before the case was turned over to the jury.[8]

Of the information Allied Concrete complained was withheld, the trial court found that Allied had everything prior to trial with the exception of the March 26, 2009 email, which was not revealed to Allied Concrete until after trial.  We note, however, that the content of the March 26, 2009 email was limited to a description of the photograph Tafuri downloaded from Lester's Facebook account accompanied by instructions that Lester should "clean up [his] facebook and myspace."  As this picture was eventually offered into evidence and the fact that Lester was told to delete pictures from his Facebook account was presented to the jury, this evidence is clearly duplicative.

> "When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached," we will affirm the judgment notwithstanding the potential for a defect or imperfection in the process by which the judgment was obtained.

Centra Health, Inc. v. Mullins, 277 Va. 59, 81, 670 S.E.2d 708, 719 (2009) (quoting Code § 8.01-678).

In the present case, the record demonstrates that Allied Concrete received a fair trial on the merits.  There is ample

---

[8] Additionally, the trial court awarded Allied Concrete the attorney's fees and costs it expended in addressing and defending against the misconduct.

evidence that the trial court mitigated any prejudice Allied Concrete may have suffered as a result of the misconduct of both Lester and Murray. Furthermore, the record demonstrates that the trial court carefully considered this misconduct in denying Allied Concrete's motion for a new trial. Accordingly, it cannot be said that the trial court abused its discretion in refusing to grant a retrial.[9]

## B. JUROR MISCONDUCT

Allied Concrete next argues that the trial court erred in denying its motion for a mistrial on the grounds that Hoy failed to answer a <u>voir dire</u> question honestly. Allied Concrete contends that, had Hoy answered honestly, it is likely that she would have been stricken for cause. Allied Concrete further posits that, even if Hoy had misunderstood the question, Murray was fully aware of the relationship between Meals on Wheels and the Allen Firm. Relying on the Virginia Rules of Professional Conduct, Allied Concrete asserts that Murray had an affirmative duty to disclose the relationship.

---

[9] Allied Concrete's argument relies heavily on Federal Rule of Civil Procedure Rule 60(b)(3), which provides for relief from judgment on the basis of fraud or misconduct. We note, however, that even if this rule was applicable, it requires the party seeking relief to "demonstrate that such misconduct prevented him from fully and fairly presenting his claim or defense." <u>Square Constr. Co. v. Washington Metro. Area Transit Auth.</u>, 657 F.2d 68, 71 (4th Cir. 1981). Here, as previously noted, Allied Concrete has failed to make such a demonstration.

"A trial court's ruling denying a motion for mistrial will be set aside on appellate review only if the ruling constituted an abuse of discretion."  Robert M. Seh Co. v. O'Donnell, 277 Va. 599, 603, 675 S.E.2d 202, 205 (2009).

It has been recognized that, "'[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials."  Brown v. United States, 411 U.S. 223, 231-32 (1973) (quoting Bruton v. United States, 391 U.S. 123, 135 (1968)).

> One touchstone of a fair trial is an impartial trier of fact – "a jury capable and willing to decide the case solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Voir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors.

McDonough Power Equip. v. Greenwood, 464 U.S. 548, 554 (1984).

Where a party seeks a new trial due to allegations of juror dishonesty during voir dire,

> a litigant must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

Blevins v. Commonwealth, 267 Va. 291, 296-97, 590 S.E.2d 365, 368 (2004), (citing McDonough, 464 U.S. at 556).

In the present case, the dispositive issue before this Court is whether Hoy's silence in response to the question about

15

her relationship with the Allen Firm amounts to a dishonest response to a material question. Contrary to Allied Concrete's argument, Hoy's subjective interpretation of the question is the proper focus of the trial court's analysis on this issue. It has been recognized that there is a significant difference between a juror giving a honest but mistaken answer and giving a dishonest answer.

> To invalidate the result of a . . . trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination.

McDonough, 464 U.S. at 555.

In the present case, the trial court asked "Do you know [any of the attorneys] or have significant involvement with them or their law firms?" The record demonstrates that, while Hoy may have known of Murray, there is no evidence that she actually knew Murray. The only interaction between Hoy and Murray was one email exchange, initiated by Hoy, seven months before the trial. Furthermore, the email was not sent to Murray directly, but to the Allen Firm website and then routed to Murray. Murray specifically testified that he had never met or spoken with Hoy

16

and there is no evidence to the contrary.  Similarly, a separate email exchange between Hoy and Emily Krause, the Allen Firm's marketing director, merely indicates that Hoy knew Murray's family; it does not indicate that she knew Murray himself. Thus, as the trial court found, the evidence was insufficient to prove that Hoy was dishonest with regard to knowing Murray.

Regarding the issue of Hoy's "significant involvement" with Murray or the Allen Firm, it is important to note that the question was asked in the present tense.  As Hoy had retired from Meals on Wheels six months prior to the trial, her silence was not dishonest because, at the time of voir dire, Hoy did not have any involvement, much less significant involvement, with either Murray or the Allen Firm.[10]  Furthermore, as the trial court noted, it is possible that Hoy did not believe that the

---

[10] Similarly, Allied Concrete's argument that Hoy should have known to speak up based on the actions of other jurors is unavailing.  It has been recognized that:

> The varied responses to respondents' question on voir dire testify to the fact that jurors are not necessarily experts in English usage.  Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges.

McDonough, 464 U.S. at 555.

The question, on its face, could be interpreted a number of different ways.  Therefore, the fact that another juror may have interpreted the question in a different manner, without more, has no bearing on Hoy's interpretation of the question.

Allen Firm's involvement with Meals on Wheels was significant, as the donations from the Allen Firm accounted for less than 1% of Meals on Wheels' annual budget.  Thus, as the trial court found, there is insufficient evidence to "establish that Hoy's failure to respond . . . to the question was dishonest." Indeed, there is clear evidence that, based on the specific question asked, Hoy's response was completely honest. Accordingly, we will affirm the decision of the trial court.[11]

## C. REMITTITUR

In his appeal, Lester argues that the trial court abused its discretion by failing to properly consider the evidence supporting the jury's award.  Lester points to numerous unchallenged facts in this case that the trial court failed to consider in ordering remittitur, such as the fact that he was present when Jessica was injured, that he was the one legally responsible for deciding to remove Jessica from life support, and that he was diagnosed with depression and post-traumatic stress disorder as a result.  Lester notes that, although the trial court claims it considered the evidence in the light most

---

[11] We further note that, even assuming that Murray knew of Hoy's past relationship to the Allen Firm and that his failure to inform the trial court violated a Rule of Professional Conduct, nothing in our jurisprudence requires that such a violation automatically result in a mistrial.  Cf., Spence v. Commonwealth, 60 Va. App. 355, 369 n.6, 727 S.E.2d 786, 793 n.6 (2012) ("A violation of a particular rule of professional conduct does not ipso facto require reversal of a criminal conviction.").

favorable to him, the record does not clearly establish that fact. According to Lester, the record actually demonstrates that the trial court only viewed the evidence that was most unfavorable to him. He further contends that the trial court's use of the jury's award to the Scotts as a benchmark for his award was erroneous because his relationship with Jessica was different from Jessica's relationship with her parents.

> Where the attack upon . . . a verdict is based upon its alleged excessiveness, if the amount awarded is so great as to shock the conscience of the court and to create the impression that the jury has been motivated by passion, corruption or prejudice, or has misconceived or misconstrued the facts or the law, or if the award is so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision, the court is empowered, and in fact obligated, to step in and correct the injustice.

Edmiston v. Kupsenel, 205 Va. 198, 202, 135 S.E.2d 777, 780 (1964).

> Setting aside a verdict as excessive . . . is an exercise of the inherent discretion of the trial court and, on appeal, the standard of review is whether the trial court abused its discretion.

Poulston v. Rock, 251 Va. 254, 258-59, 467 S.E.2d 479, 482 (1996) (citing Bassett Furniture v. McReynolds, 216 Va. 897, 911, 224 S.E.2d 323, 332 (1976)).

In determining whether a trial court has abused its discretion in granting remittitur, we apply a two-step analysis:

> (1) we must find in the record both the trial
> court's conclusion the verdict was excessive and
> its analysis demonstrating that it "considered
> factors in evidence relevant to a reasoned
> evaluation of the damages" when drawing that
> conclusion, and then
>
> (2) we must determine whether the remitted award
> is "reasonably related to the damages disclosed
> by the evidence."

Government Micro Res., Inc. v. Jackson, 271 Va. 29, 44-45, 624

S.E.2d 63, 71 (2006) (alterations omitted) (quoting Poulston,

251 Va. at 259, 467 S.E.2d at 482).

> Both of these steps require an evaluation of the
> evidence relevant to the issue of damages.  In
> making that evaluation, the trial court, as well
> as this Court, is required to consider the
> evidence in the light most favorable to the party
> that received the jury verdict, in this case the
> plaintiff.  If there is evidence, when viewed in
> that light, to sustain the jury verdict, then
> remitting the verdict is error.

Shepard v. Capitol Foundry of Va., 262 Va. 715, 721, 554 S.E.2d

72, 75 (2001) (citation omitted).

In the present case, the trial court granted remittitur on

two alternative grounds.  The trial court initially relied upon

its finding that the jury's award to Lester was disproportionate

when compared to the jury's award to the Scotts.  This was

error.  Although a trial court may grant remittitur on the

grounds that the award is disproportionate to the injuries

suffered, Edmiston, 205 Va. at 202, 135 S.E.2d at 780, we have

specifically rejected comparing damage awards as a means of

20

measuring excessiveness.  Rose v. Jaques, 268 Va. 137, 159, 597 S.E.2d 64, 77 (2004).

The trial court also found that "the amount of the verdict in this case is so excessive on its face as to suggest that it was motivated by bias, sympathy, passion or prejudice, rather than by a fair and objective consideration of the evidence."  In making this ruling, the trial court specifically found that Murray's actions at trial were "geared toward inflaming the jury," which contributed to the jury's excessive verdict.  The trial court also noted that Allied Concrete's aggressive defense strategy further served "to create additional passion and sympathy for Lester and anger towards [Allied Concrete]."[12]  However, assuming that the trial court correctly concluded that the jury verdict was improperly motivated by Murray's "theatrics" and Allied Concrete's failed litigation strategy, the trial court provided no basis for us to ascertain, nor can we independently ascertain, "whether the amount of recovery after remittitur bears a reasonable relation to the damages disclosed by the evidence."  Shepard, 262 Va. at 721, 554 S.E.2d at 75 (internal quotation marks omitted).  It is apparent that the trial court simply reduced Lester's award to match the

---

[12] It should be noted that Allied Concrete never sought remittitur on this basis.  Nor could it, as it would be highly illogical to afford Allied Concrete relief on the basis of its own unsuccessful litigation strategy.

Scotts' individual awards and then added the economic loss Lester suffered as a result of Jessica's death. Such an approach ignores the inherent differences in the two types of relationships and thereby the differences in damages.

It is axiomatic that the loss of a spouse is significantly different from the loss of a child. Clearly the relationship between Jessica and Lester was unique to them and different from the relationship between Jessica and her parents. Indeed, the trial court acknowledged as much. As such, the injuries suffered by Lester and the Scotts as a result of her death were necessarily different and, therefore, must result in different awards. However, with the exception of Lester's economic losses, nothing in the record indicates that the trial court examined the damages specific to Lester or the Scotts. Thus, there is no evidence that the trial court made a reasoned evaluation of the damages. Accordingly, having determined that the trial court abused its discretion in granting remittitur, we will reinstate the jury's damage award and enter final judgment on the verdict. See id. at 723, 554 S.E.2d at 76-77; Baldwin v. McConnell, 273 Va. 650, 660, 643 S.E.2d 703, 708 (2007); Government Micro Res., 271 Va. at 49, 624 S.E.2d at 74; Poulston, 251 Va. at 264, 467 S.E.2d at 485; Edmiston, 205 Va. at 204, 135 S.E.2d at 781.

III. CONCLUSION

Allied Concrete was fully aware of the misconduct of Murray and Lester prior to trial and the trial court took significant steps to mitigate the effect of the misconduct.  Therefore, it cannot be said that the trial court abused its discretion in refusing to grant a retrial on that basis.  Furthermore, the evidence demonstrates that Hoy's failure to answer was not due to dishonesty on her part.  Indeed, the evidence adduced at trial would tend to show that Hoy's lack of a response was, in fact, an honest answer to the questions asked.  Accordingly, the trial court did not err in denying Allied Concrete's motion for a mistrial on alleged juror misconduct.

Regarding the issue of remittitur, it is apparent that the trial court based its decision to grant remittitur on an improper comparison of awards and failed to provide any way of ascertaining whether the remitted award bears a "reasonable relation" to the damages suffered by Lester.  Accordingly, we will reverse the trial court's order of remittitur and reinstate the jury's verdict.

> Record No. 120074 – Affirmed.
> Record No. 120122 – <u>Reversed and final judgment</u>.

JUSTICE McCLANAHAN, concurring in part and dissenting in part.

With this opinion, the Court has finally divested the trial courts of their power over jury verdicts, rejecting the

23

ancient and accepted doctrine of the common law,
that judges have the power and are clearly
charged with the duty of setting aside verdicts
where the damages are either so excessive or so
small as to shock the conscience and to create
the impression that the jury has been influenced
by passion or prejudice, or has in some [way]
misconceived or misinterpreted the facts or the
law which should guide them to a just conclusion.

Bassett Furniture Indus., Inc. v. McReynolds, 216 Va. 897, 912 n.*, 224 S.E.2d 323, 332 n.* (1976) (quoting Chesapeake & Ohio Ry. Co. v. Arrington, 126 Va. 194, 217, 101 S.E. 415, 423 (1919)).

What the Court refers to as a "two-step analysis" in fact consists of multiple hoops through which a trial court must now jump before it remits a jury verdict. Since this Court first articulated the "number of determinations" that must be made when a party challenges the trial court's exercise of discretion to remit a verdict, that number has steadily increased.[1] As each

---

[1] In Poulston v. Rock, 251 Va. 254, 259, 467 S.E.2d 479, 482 (1996), the Court stated that the standard by which the trial court's exercise of discretion must be tested by this Court "requires us to make a number of determinations." The Court must "find in the record both the trial court's conclusion that the verdict was excessive and a demonstration that, in reaching that conclusion, the trial court considered 'factors in evidence relevant to a reasoned evaluation of the damages'" and must then "determine whether the amount of the recovery after the remittitur bears a 'reasonable relation to the damages disclosed by the evidence.' " Id. (quoting Bassett, 216 Va. at 912, 224 S.E.2d at 332). In addition, the Court must evaluate the evidence in the light most favorable to "the party who received the jury verdict." Poulston, 251 Va. at 261, 467 S.E.2d at 483. In Shepard v. Capitol Foundry of Va., 262 Va. 715, 723, 554 S.E.2d 72, 76 (2001), the Court went beyond a determination of

24

new factual scenario comes before the Court, a new determination, test, or restriction emerges from the Court, placing the trial courts in the unenviable position of having to speculate as to whether their remittitur will withstand this Court's next test. Meanwhile, the Court has chipped away at the trial court's "inherent discretion" to the extent that such discretion exists only in theory.[2]

Today the Court introduces yet another restriction on the trial court's power to remit a jury verdict. According to the majority, the trial court must provide a way for this Court to

---

whether the recovery after remittitur bore a reasonable relation to the evidence and included in its analysis a determination of whether the facts "demonstrate[d] that the verdict was not excessive." In Government Micro Resources, Inc. v. Jackson, 271 Va. 29, 49, 624 S.E.2d 63, 74 (2006), the Court determined whether there were "elements of recovery upon which the compensatory damage award could be based." In Baldwin v. McConnell, 273 Va. 650, 656, 643 S.E.2d 703, 706 (2007), the Court concluded the trial court failed to ascertain whether the amount of the recovery after remittitur bore a reasonable relation to the evidence of damages despite the fact that this duty had previously been considered the second step of the review undertaken by our Court.

[2] This Court has identified three circumstances that "compel setting aside a jury verdict." Poulston, 251 Va. at 258, 467 S.E.2d at 481. The first is a "damage award that is so excessive that it shocks the conscience of the court, creating the impression that the jury was influenced by passion, corruption, or prejudice." Id. The second is when the jury has "misconceived or misunderstood the facts or the law." Id. The third is an award that "is so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision." Id. Setting aside a verdict under any one of these circumstances "is an exercise of the inherent discretion of the trial court." Id. at 258-59, 467 S.E.2d at 482.

25

ascertain whether the amount of recovery after remittitur bears a reasonable relation to the damages. This determination can be made, and has previously been made by this Court, through "an evaluation of the evidence relevant to the issue of damages." Shepard v. Capitol Foundry of Va., 262 Va. 715, 721, 554 S.E.2d 72, 75 (2001). Therefore, as the Court's opinion illustrates, whether a jury's verdict has been motivated by passion, corruption or prejudice, rather than the evidence before it, is no longer the predominant concern. Instead, the primary focus of the Court is ensuring compliance with the increasingly technical requirements it continues to impose on the language of the trial court's order of remittitur.

In this case, the trial court explained in detail both why it found the jury's verdict was motivated by passion, corruption, or prejudice as well as why the award was so out of proportion to the injuries suffered as to suggest it was not the product of a fair and impartial decision. The trial court stated three times that it was reviewing the evidence in the light most favorable to Lester while noting specifically the evidence regarding the length of his marriage and his behavior after his wife's death, demonstrating it "considered factors in evidence relevant to a reasoned evaluation of the damages." Poulston, 251 Va. at 259, 467 S.E.2d at 482 (internal quotation marks omitted). Evaluating its remitted award, the trial court

26

took into account the "injuries actually suffered" by Lester, acknowledged that Lester suffered loss not sustained by the Scotts, and remitted the award to an amount a little over twice that awarded to each of the Scotts. Based on its analysis of the "injuries actually suffered" by Lester, the trial court determined that the remitted award bore "a reasonable relation to the damages disclosed by the evidence." Id. (internal quotation marks omitted). Accordingly, applying the "two-step analysis," I would conclude the trial court was well within its discretion to order the remittitur.[3]

In my view, the singular ability of the trial court to assess whether the jury has been motivated by passion or prejudice has been disregarded, and its inherent discretion to correct a verdict that it finds so excessive as to shock the conscience of the court has been discarded. Yet,

---

[3] Although the majority finds it was error to compare the jury's award to Lester with its awards to the Scotts, I disagree. While we have rejected comparing statewide or nationwide jury verdicts to reach an "average verdict," this is not what the trial court did. See Rose v. Jaques, 268 Va. 137, 159, 597 S.E.2d 64, 77 (2004) (rejecting argument that jury's verdict was excessive when compared to other post-traumatic stress disorder (PTSD) cases statewide and nationally); John Crane, Inc. v. Jones, 274 Va. 581, 595, 650 S.E.2d 851, 858 (2007) (stating "average verdict rule" was rejected in Rose). The trial court did not look to statewide or nationwide verdicts in wrongful death cases to determine an "average verdict," but considered the injuries suffered by the Scotts and those suffered by Lester to support its finding that the award granted to Lester by the jury bore "no reasonable relation to the damages proven by the evidence." The trial court based its finding on the evidence at trial, which is precisely its charge.

> [a]s we have often noted, "[t]here are many incidents which occur in the trial of a common law case which a trial judge observes but which cannot be reproduced in the cold printed page." American Oil Co. v. Nicholas, 156 Va. 1, 12, 157 S.E. 754, 758 (1931). We did not see or hear the [parties] as they testified. We do not know whether they appeared cooperative or defiant, responsive or evasive, candid or disingenuous. The trial judge was in a unique position to hear the tone and tenor of the dialogue, observe the demeanor of the witnesses, and assess the reaction of the jurors to what they saw and heard.

Hogan v. Carter, 226 Va. 361, 373-74, 310 S.E.2d 666, 673 (1983). See also Richmond Newspapers, Inc. v. Lipscomb, 234 Va. 277, 300, 362 S.E.2d 32, 45 (1987) ("We must necessarily accord the trial court a large measure of discretion in remitting excessive verdicts because it saw and heard the witnesses while we are confined to the printed record.").

With this Court's ever evolving limitations upon the power and duty of trial judges to order remittitur, for all practical purposes the last nail in the coffin of remittitur has been driven, sounding a death knell for the important safety-valve that remittitur has represented in operating the system of jury trials in Virginia.

I would, therefore, affirm the trial court's judgment in its entirety since I agree with the majority that the trial court did not abuse its discretion in refusing to grant a

28

retrial on the basis of the misconduct by Lester and Murray or err in refusing to grant a mistrial due to juror misconduct.